2011 UT App 104

**Paul TIMOTHY and Janice Timothy, Plaintiffs and Appellees,**

v.

**TERI KEETCH, THOMAS KEETCH, and Rebecca Mendenhall, Defendants and APPELLANTS.**

No. 20090778–CA.

Court of Appeals of Utah.

March 31, 2011.

Michael K. Black, Provo, for Appellants.

Nelson Abbott, Provo, for Appellees.

Before Judges McHUGH, ORME, and VOROS.

OPINION

ORME, Judge:

¶ 1 This appeal concerns fraud, and the key issue is whether it is reasonable to rely on a party's representation that an asset is owned "free and clear" when a check of the public record would show otherwise. The trial court held such reliance to be reasonable in this case. We affirm.

BACKGROUND

¶ 2 Defendants Teri and Thomas Keetch (Defendants) desired to establish a therapeutic horse ranch as a business venture. A therapeutic horse ranch of the sort that Defendants had in mind would be a place where children who were victims of abuse could ride and care for horses as a means of healing. Defendants, however, lacked sufficient funds to start the ranch.

¶ 3 In the summer of 2000, Defendants sought to secure financing from MSF Properties through Kevin Wright, a loan officer with MSF and previous employer of defendant Teri Keetch, to purchase a stallion for breeding purposes. Defendants eventually borrowed $102,000 from MSF and pledged the stallion—a quarterhorse named Hesa

Son of a Dun (the Horse)—as collateral for the loan. The transaction was memorialized in a security agreement,[1] *see* Utah Code Ann. § 70A–9a–203(1) (2009), and a financing statement was filed with the Division of Corporations and Commercial Code,[2] *see id.* § 70A–9a–501(2).

¶ 4 A month or two later, Plaintiffs Paul and Janice Timothy were contacted by Rebecca Mendenhall, a broker representing Defendants. Mendenhall proposed that Plaintiffs make a bridge loan[3] to Defendants. She indicated the loan would be used to fund Defendants' therapeutic horse ranch.

¶ 5 The parties met at a fast food restaurant in Lehi, Utah, to discuss the transaction. Defendants offered to pledge the Horse as security for the loan. Following the meeting, defendant Teri Keetch showed plaintiff Paul Timothy the Horse. Teri said that she owned the Horse and that it was worth between $125,000 and $175,000. Paul asked Teri if the Horse was encumbered in any way. Teri stated that the Horse was not encumbered.

¶ 6 On September 28, 2001, Paul and defendant Thomas Keetch met at Mendenhall's office. Paul asked Thomas several questions concerning his financial status. Thomas gave false answers to many of these questions, including the purposes for the loan and whether Defendants owned the Horse free and clear.

¶ 7 After this meeting, Paul asked the Horse's trainer if the Horse was encumbered. He also inquired of the American Quarter Horse Association, which maintains ownership, lien, and breeding records for quarterhorses. Neither had any knowledge of any prior encumbrances. Plaintiffs did not check Uniform Commercial Code filings to see if a financing statement had been filed on the Horse.[4] Had they done so, they would have discovered that, contrary to Defendants' representations, the Horse was already serving as collateral on the loan MSF made to Defendants, MSF having filed a UCC–1[5] to perfect its security interest in the Horse.

¶ 8 Oblivious to the Horse's true status, Plaintiffs made the bridge loan to Defendants, secured—or so they thought—by the full value of the Horse. MSF seized the Horse in October of 2001, after Defendants defaulted on their loan from MSF. When Defendants later defaulted on the bridge loan, Plaintiffs learned that their collateral had been lost to MSF. Plaintiffs brought this action against Defendants, alleging several causes of action, including breach of contract and fraud.

¶ 9 A bench trial was held in due course, after which the court issued its Findings of Fact and Conclusions of Law. The court found in favor of Plaintiffs on the breach of

1. A security interest in personal property is created by means of a security agreement, giving the secured party the right to the collateral or its proceeds in the event of the borrower's default. *See* Utah Code Ann. § 70A–9a–203(6) (2009).

2. A financing statement serves to perfect the security interest a lender has in collateral, meaning that in the event a third party makes a claim on the collateral, the party with the perfected interest has priority over the third party who subsequently takes a security interest in or otherwise deals with the collateral, whether or not the third party has actual notice of the lender's interest. *See* Utah Code Ann. § 70A–9a–201(1). *See also Insley Mfg. Corp. v. Draper Bank & Trust,* 717 P.2d 1341, 1347 (Utah 1986) (explaining that perfection of a security interest gives the party that has perfected it priority over third parties); James J. White & Robert S. Summers, Uniform Commercial Code 796–97 (1972) (same).

3. A bridge loan is a short-term loan, often used as a means of interim financing until permanent financing can be obtained. *See* BusinessDiction-

ary.com, Definition of Bridge Loan, http://www.businessdictionary.com/definition/bridge-loan.html (last visited March 29, 2011).

4. In Utah, UCC filings are maintained by the Division of Corporations and Commercial Code. *See* Utah Code Ann. § 70A–9a–501(2) (2009). The Division maintains an online database where UCC filings can be both filed and checked. *See* Department of Commerce, Uniform Commercial Code Search, https://secure.utah.gov/uccsearch/uccs (last visited March 29, 2011). Checking UCC filings in Utah by searching the last name of a party can be done free of cost through the online database. *See id.*

5. The form known as a UCC–1 is a standardized financing statement, available at the Division's website. *See* UCC Financing Statement, http://www.corporations.utah.gov/pdf/uccone.pdf (last visited March 29, 2011).

contract claim. Defendants do not challenge this ruling on appeal. The court also ruled in favor of Plaintiffs on the fraud claim, specifically finding that Defendants had misrepresented their ownership of the Horse as being free and clear, knowing they had already used the Horse as collateral for their loan from MSF. The trial court concluded that Plaintiffs reasonably relied on these misrepresentations, noting its own surprise that a UCC–1 filing could be made on a "living animal." Defendants now appeal, challenging the fraud determination and, in particular, the trial court's determination that Plaintiffs' reliance on Defendants' misrepresentations about the Horse was reasonable.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 10 Defendants' primary contention on appeal is that Plaintiffs had a duty to check the UCC filings and were not free to take Defendants' false statements about the Horse at face value.[6] Plaintiffs assert that they acted reasonably in relying on Defendants' representations that Defendants owned the Horse free and clear and were under no duty to confirm the accuracy of these representations by checking the UCC filings. Reasonable reliance is generally a factual matter, within the province of the finder of fact, but in some cases it can be decided as a matter of law. *See Armed Forces Ins. Exch. v. Harrison,* 2003 UT 14, ¶ 34, 70 P.3d 35.

## ANALYSIS

■ ¶ 11 MSF's prior UCC–1 filing on the Horse is not in dispute. Nor do Plaintiffs contend that they would not have discovered it had they checked whether there were any UCC filings pertaining to the Horse. Defendants argue that because a lien on the Horse existed and could readily be found, Plaintiffs did not act reasonably in relying on Defendants' statements that the Horse was not encumbered.

**6.** It should be noted that Defendants do not admit to misrepresenting the facts. Instead, mindful of the factual findings made by the trial court on disputed evidence, they claim that as a matter of law, Plaintiffs had constructive notice as to the

■ ¶ 12 In general, Utah law does not require one to inspect the public record to verify the truthfulness of statements made to him or her. *See Christenson v. Commonwealth Land Title Ins. Co.,* 666 P.2d 302, 307 (Utah 1983). In *Christenson,* an escrow company represented that a land development company held an interest in property that it actually did not have. *See id.* at 304. The injured party sued because the escrow company's representations "that certain properties held in escrow had unencumbered equity values available as security for the plaintiff" were not true. *See id.* at 303. On appeal, the Utah Supreme Court held in favor of the plaintiff, noting that a defendant who makes misrepresentations, even negligently, can be held liable. *See id.* at 305. As to reasonable reliance, the Court differentiated between available documents that are part of a transaction and documents contained in public records, and stated that "failure to examine public records does not defeat an action for a false representation because in most cases there is no duty to make such an examination." *Id.* at 307.

¶ 13 We considered the doctrine of reasonable reliance in *Conder v. A.L. Williams & Associates, Inc.,* 739 P.2d 634 (Utah Ct.App. 1987), and held that

a plaintiff may justifiably rely on positive assertions of fact without independent investigation. It is only where, under the circumstances, the facts should make it apparent to one of his knowledge and intelligence, or he has discovered something which should serve as a warning that he is being deceived, that a plaintiff is required to make his own investigation.

*Id.* at 638 (citations omitted). *See also Robinson v. Tripco Inv., Inc.,* 2000 UT App 200, ¶ 21, 21 P.3d 219 (holding that even when plaintiff held himself out as an expert, inspected the property, and inquired about problems he observed, genuine issue of material fact existed as to whether he acted in reasonable reliance on defendant's misrepre-

Horse's true status, by reason of the UCC–1 filing, and thus cannot prevail on a fraud claim, even given the facts as found—adversely to Defendants—by the trial court.

851

sentations); *In re Ghere,* 393 B.R. 209, 218–21 (Bankr.W.D.Mo.2008) (holding that debt owed to a creditor was nondischargeable as fraudulent even though the creditor could have discovered misrepresentations by doing a rudimentary UCC check).

¶ 14 Applying these principles to the facts found by the trial court, Plaintiffs were not required to check for prior UCC filings on the Horse. The trial court found that Defendants unqualifiedly represented they owned the Horse free of prior encumbrances. Nothing in the transaction, in Defendants' representations, in Paul's visit to the ranch, or in the inquiries Plaintiffs made suggested anything that would "serve as a warning" that they were being deceived. *See Conder,* 739 P.2d at 638.

### CONCLUSION

¶ 15 We conclude that the trial court correctly determined that Plaintiffs acted in reasonable reliance on Defendants' misrepresentations despite the fact that they did not do a search of the UCC filings, which we hold they had no duty to do in this case. Because Plaintiffs were awarded attorney fees by the trial court and prevailed on appeal, they are entitled to recover their attorney fees reasonably incurred on appeal. *See Management Servs. Corp. v. Development Assocs.,* 617 P.2d 406, 409 (Utah 1980). We remand to the trial court to determine and award the amount of attorney fees reasonably incurred by Plaintiffs on appeal. Otherwise, we affirm.

¶ 16 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and J. FREDERIC VOROS JR., Judge.