2021 UT 42

IN THE

# SUPREME COURT OF THE STATE OF UTAH

AL-IN PARTNERS, LLC, BRADLEY DIXON
*Appellees,*

*v.*

LIFEVANTAGE CORPORATION,
*Appellant.*

No. 20190565
Heard April 14, 2021
Filed August 12, 2021

On Interlocutory Appeal

Third District, Salt Lake
The Honorable Andrew H. Stone
No. 170907711

Attorneys:

Gregory M. Saylin, Brittany J. Merrill, Salt Lake City, for appellant

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1   An independent distributor sued a wellness company for breach of contract, claiming that the company had waived the provision upon which it later relied to terminate the distributor's contract. The distributor alleged that the company effected the waiver through express oral statements and conduct. The company moved to dismiss, arguing that because the contract contained both an antiwaiver provision and a requirement that any waiver be in writing, anything less was insufficient as a matter of law to waive a provision of the contract. The district court denied the motion and the company filed this interlocutory appeal.

¶2    A contracting party alleging waiver must show the other party intentionally waived both the underlying provision and any applicable antiwaiver provisions. Here, the distributor's allegation of an express oral waiver was legally sufficient to defeat a motion to dismiss. We affirm.

## BACKGROUND[1]

¶3    In 2009, Plaintiff Bradley Dixon, his wife Shelly, and their friends Corey and Denise Ray became some of the first independent distributors of products from LifeVantage, a multi-level marketing company that "manufactures wellness products which it markets and sells to consumers through a network of independent distributors." Like all independent distributors, Dixon entered into the LifeVantage Distributor Application and Agreement (the Agreement), which incorporated the company's policies and procedures (the P&Ps).

¶4    Relevant here, the Agreement permitted an independent distributor to own only one distributorship (the individual distributorship provision). And any breach of the Agreement could result in LifeVantage terminating the contract.

¶5    The Agreement also contained an antiwaiver provision, which stated that:

> The company never gives up its right to insist on compliance with the Agreement . . . . No failure of LifeVantage to exercise any right or power under the Agreement or to insist upon strict compliance by an Independent Distributor with any obligation or provision of the Agreement, and no custom or practice of the parties at variance with the terms of the Agreement[] shall constitute a waiver of LifeVantage's right to demand exact compliance with the Agreement.

---

[1] On appeal from a motion to dismiss, "we accept the factual allegations in the complaint as true and interpret those facts, and all reasonable inferences drawn therefrom, in a light most favorable to the plaintiff as the nonmoving party." *Olguin v. Anderton*, 2019 UT 73, ¶ 4 n.3, 456 P.3d 760 (citation omitted).

¶6 Further, the Agreement specified that any waiver could be effected "only in writing by an authorized officer of the Company" (the written waiver requirement).

¶7 Bradley Dixon owned Distributorship 101982 and Corey Ray owned Distributorship 101987. Despite Distributorship 101987 being "organized under Ray's name," Dixon and Ray worked jointly to develop its "downline" and the pair focused all of their efforts on it. They shared equally in the profits. Within one year of this operation, LifeVantage recognized Dixon and Ray as "elite distributors" and presented them with "Certificates of Accomplishment." Dixon and Ray were featured as co-owners of Distributorship 101987 in at least three separate issues of *Prosper* magazine, which "LifeVantage funds or otherwise uses as a marketing tool." LifeVantage sent Dixon to train lower-level distributors at "events across the globe" and "awarded both Dixon and Ray for Distributorship 101987's success with vacation[s] and a new Jeep Wrangler." Dixon's individual distributorship never achieved "elite status."

¶8 In 2013, Ray and Dixon formed AL-IN Partners, LLC (AL-IN), which they each owned in equal parts. They decided to assign ownership of Distributorship 101987 to their new partnership. So Dixon, who was a member of LifeVantage's Advisory Board Committee, approached LifeVantage CEO Doug Robinson, Vice President of Sales Ryan Thompson, and Chief Compliance Officer Ed Merchant at a LifeVantage board meeting to discuss ownership of Distributorship 101987. Because of the individual distributorship provision, "Dixon discussed with Robinson, Thompson, and Merchant how he could acquire an ownership interest in Distributorship 101987 as a member of [AL-IN] while remaining in compliance" with the P&Ps. Dixon suggested he relinquish ownership in his individual distributorship, but Robinson and Thompson "both affirmatively stated that Dixon need not transfer" that ownership "before formally acquiring an ownership interest in Distributorship 101987." Thompson told Dixon that he and Ray need only complete a Distributorship Name Change Form to transfer ownership of Distributorship 101987 to AL-IN. They did so, and LifeVantage approved the form and modified the account to remove Ray's name and list AL-IN as the owner of Distributorship 101987.

¶9 After LifeVantage approved the name change form, it began paying commissions from Distributorship 101987 to AL-IN.

And "LifeVantage continued to announce and promote Dixon and Ray as partners in Distributorship 101987 at trainings, conventions, meetings, and other public forums."

¶10 But in 2016, LifeVantage terminated Distributorship 101987, citing a violation of the individual distributorship provision. Shortly thereafter, pursuant to an agreement with LifeVantage, Ray ended his ownership in AL-IN and was reinstated as a distributor for the company. This left Dixon as the sole owner of AL-IN. LifeVantage then stopped paying Distributorship 101987's commissions to AL-IN and channeled the commissions to Ray.

¶11 Dixon and AL-IN (collectively, AL-IN) sued LifeVantage, seeking a declaratory judgment that LifeVantage had waived its right to enforce the individual distributorship provision and that it improperly terminated Distributorship 101987 because of this waiver. AL-IN also alleged breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel.

¶12 LifeVantage moved to dismiss, contending, among other things, that the breach of contract and declaratory judgment claims failed as a matter of law because AL-IN did not plead facts sufficient to establish that LifeVantage waived the individual distributorship provision. Specifically, LifeVantage pointed to the Agreement's antiwaiver provision and written waiver requirement. And it argued that because AL-IN's complaint did not assert the existence of any writing by a company officer waiving the individual distributorship provision, the allegations in the complaint were "plainly insufficient . . . to amount to waiver."

¶13 In opposition, AL-IN asserted that it "pled allegations from which a fact finder could determine that under the totality of the circumstances, LifeVantage both expressly and impliedly waived its right to enforce" the individual distributorship provision. And it argued that the antiwaiver provision "is simply one factor in the totality of the circumstances analysis" to determine whether LifeVantage waived that provision.

¶14 Shortly after briefing was complete on the motion to dismiss, we issued *Mounteer Enterprises, Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, 422 P.3d 809, which LifeVantage submitted to the district court as supplemental authority. In *Mounteer*, we held in the context of an implied waiver that "a party asserting waiver in the face of an antiwaiver clause must establish 'a clear intent to waive *both* the [antiwaiver]

clause and the underlying contract provision.'" *Id.* ¶ 21 (alteration in original) (citation omitted). LifeVantage argued that, because AL-IN made "no reference to the antiwaiver provisions" in its complaint, it had "failed to allege an adequate factual basis" for waiver of these provisions and thus could not state a claim for breach of contract or declaratory judgment.

¶15 After oral argument, the district court granted the motion to dismiss as to AL-IN's claims for breach of the covenant of good faith and fair dealing and promissory estoppel, but denied it as to the claims for breach of contract and declaratory judgment. In its oral ruling, the court recognized that "*Mounteer* establishes a fairly high burden of proof for plaintiffs seeking to prove waiver of a provision and separately to prove waiver of the antiwaiver provisions; and for that matter, in this case, to prove waiver of the requirement that any waiver be made in writing by an officer." But the court noted that "*Mounteer* also appears to draw a distinction between sins of omission and sin[s] of commission." So, because AL-IN alleged "affirmative conduct by officers of LifeVantage . . . that [Dixon] didn't have to divest himself . . . [of his] individual distributorship and could maintain joint ownership of another distributorship," the court concluded that the complaint was sufficient to defeat the motion to dismiss as to the breach of contract and declaratory judgment claims.

¶16 We granted LifeVantage's petition for interlocutory appeal. We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶17 The issue before us is whether the district court erred when it denied LifeVantage's motion to dismiss with respect to the breach of contract and declaratory judgment claims. "A ruling on a motion to dismiss presents a legal question that we review for correctness, affording no deference to the district court's decision." *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 7, 284 P.3d 600.

## ANALYSIS

¶18 Before we proceed to the merits of this question, we must address the fact that Appellee AL-IN did not file a brief or otherwise appear in this interlocutory appeal. So, we discuss as an initial matter how this affects our resolution of this case.

¶19 An appellee's failure to file a brief does not amount to an automatic default and consequent reversal of the lower court.

"[W]e do not view the failure to file a brief as a confession of error on the part of the appellee." *State v. Sorbonne*, 2020 UT App 48, ¶ 16 n.3, 462 P.3d 409. But when an appellee fails to present us with any argument, an appellant need only establish "a *prima facie* showing of a plausible basis for reversal." *Paxman v. King*, 2019 UT 37, ¶ 7, 448 P.3d 1199; *see also Broderick v. Apartment Mgmt. Consultants, L.L.C.*, 2012 UT 17, ¶¶ 18–21, 279 P.3d 391 (reversing summary judgment because the appellee "failed to address [the appellants'] arguments," leaving the appellants' claims "unrebutted"). This is a lower standard than the typical burden of persuasion on appeal. *See Utah Dep't of Transp. v. Coalt, Inc.*, 2020 UT 58, ¶ 45, 472 P.3d 942.

¶20 However, despite AL-IN's nonappearance, LifeVantage has not persuaded us that there is a plausible basis to reverse the district court here. LifeVantage argues that it is impossible to orally waive an antiwaiver provision with a written waiver requirement. Indeed, it asserts that even an express oral waiver of the individual distributor provision and the written waiver requirement itself would be insufficient to waive those provisions under the Agreement. It contends that a waiver can be accomplished only "in writing by an authorized officer of the Company," as provided in the written waiver requirement. And it argues that the district court erred in denying its motion to dismiss because AL-IN's complaint contained no allegation of a written waiver.

¶21 LifeVantage essentially argues that its written waiver requirement is unwaivable. But we have made clear that the parties to a contract may choose to waive any provision of their agreement. *See Dillman v. Massey Ferguson, Inc.*, 369 P.2d 296, 298 (Utah 1962) ("[P]arties to written contracts may modify, waive or make new terms regardless of provisions in the contracts to the contrary." (citation omitted)). "Even an antiwaiver provision is subject to waiver." *Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 20, 422 P.3d 809. Indeed, even a contract subject to the statute of frauds can be modified by oral agreement.[2] Likewise, there is no basis for us to

---

[2] *See Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 48, 258 P.3d 539 (recognizing a "narrow exception" to the requirement that modification of a contract subject to the statute of frauds be in writing "where a party has changed position by
(continued . . .)

legally restrict the parties to an agreement from choosing to waive a written waiver requirement. Rather, the question is whether the non-breaching party has intentionally relinquished the right to insist on a written waiver.

¶22 In general, waiver is an equitable remedy employed to "prevent[] a 'waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required' and then enforcing its contractual rights upon default." *Mounteer*, 2018 UT 23, ¶ 18 (citation omitted). But "[c]ourts do not lightly consider a contract provision waived." *Id.* ¶ 17. To establish the existence of a waiver, there must be "an 'intentional relinquishment of a known right,'" which can be either express or implied. *Id.* (citation omitted). So, only where "the otherwise-breaching party can show that the other party intentionally waived its rights under the contract, noncompliance with the relevant provision will not be construed as a breach." *Id.* ¶ 18.

¶23 However, when the contract at issue contains an antiwaiver provision, "[t]he calculus changes." *Id.* ¶ 19. This is because "[a]n antiwaiver provision embodies the agreement between the parties—an agreement that specifically prohibits the mere failure to enforce a contractual right as being construed as waiver of that right." *Id.* ¶ 22. To allow "waiver where the party has not clearly waived the *antiwaiver* provision would undo this agreement and would 'beg[] the question of validity of the non-waiver clause.'" *Id.* (alteration in original) (citation omitted). An antiwaiver provision provides "flexibility" to the parties "in enforcing their rights under the contract . . . without 'result[ing] in a complete and unintended loss of its contract rights if it later decides that strict performance is desirable.'" *Id.* ¶ 19 (second alteration in original) (citation omitted).

¶24 But we have made clear that both an antiwaiver provision and the requirement that any waiver be in writing are waivable. In *Calhoun v. Universal Credit Co.*, the plaintiff bought a

---

performing an oral modification so that it would be inequitable to permit the other party to found a claim or defense on the original agreement as unmodified" (citation omitted)); *Allen v. Kingdon*, 723 P.2d 394, 396–97 (Utah 1986) (same); *see also White v. Fox*, 665 P.2d 1297, 1301 (Utah 1983); *Bamberger Co. v. Certified Prods., Inc.*, 48 P.2d 489, 491–92 (Utah 1935).

car, and the note was assigned to Universal Credit Company. 146 P.2d 284, 285 (Utah 1944). The contract required payments to be made on time and stated that any default could result in immediate repossession of the vehicle. *Id.* at 286. There was also an antiwaiver provision that required any waiver to be "*evidenced by writing signed by the parties.*" *Id.* (emphasis added). Calhoun made every payment late. *Id.* at 285. After about a year, he contacted Universal to let it know he was joining the army and wanted to discuss the contract. *Id.* An adjuster for Universal told Calhoun "that he might have time to make some disposition of the automobile so that he could get his equity out of it." *Id.* But a few days later, the adjuster directed Universal to repossess the vehicle. *Id.* Calhoun sued for breach of contract, alleging the adjuster orally waived strict compliance with the contract. *Id.* The district court agreed, finding Universal guilty of conversion. *Id.* at 285–86.

¶25 Universal appealed, making the same argument that LifeVantage makes here: that "as a matter of law, there can be no waiver of strict compliance unless it be in writing." *Id.* at 286. We disagreed, stating that a waiver made intentionally and knowingly by an agent of a company who had apparent authority to do so is binding on the company—even where there is a provision in the contract "that no waiver is to become effective unless made by some particular officer . . . and *unless indorsed on the policy.*" *Id.* at 286–88. Thus, the adjuster's express statements to Calhoun effectively waived the underlying provision, the antiwaiver provision, and the written waiver clause. *Id.* at 288.

¶26 LifeVantage argues that *Calhoun* is not dispositive here because our recent decision in *Mounteer* established a new, higher burden for parties alleging waiver of a contractual provision in the face of an antiwaiver provision. But this is a misreading of *Mounteer*.

¶27 In *Mounteer*, Mounteer Enterprises, Inc. was hired by a homeowners' association (HOA) to provide snow removal services. 2018 UT 23, ¶ 1. The contract between the parties required Mounteer to maintain at least $7 million in insurance coverage. *Id.* ¶ 5. Failure to do so permitted the HOA to, among other things, "immediately terminate the contract." *Id.* ¶ 6. The contract also provided "that the HOA's failure to notice a deficiency in Mounteer's insurance coverage cannot be construed as a waiver of the insurance provision." *Id.* ¶ 2. Mounteer obtained only $5 million in insurance coverage and sent the HOA

certificates of insurance showing the $5 million policy. *Id.* ¶ 7. The HOA continued to pay "Mounteer for its services despite this deficiency." *Id.* After an unrelated disagreement between the parties, the HOA cancelled the contract, citing Mounteer's deficient insurance policy. *Id.* ¶ 8. Mounteer sued for breach of contract, arguing that by accepting the certificates of insurance showing only $5 million in coverage and by paying Mounteer, the HOA waived the insurance policy provision of the contract. *Id.* ¶ 9. The jury agreed and found the HOA liable for breach of the contract. *Id.* ¶ 12.

¶28 We reversed, holding that to establish waiver of a contractual provision where the contract contains an antiwaiver clause, the party must show not only clear intent to waive the underlying provision, but also the intent to waive the antiwaiver provision. *Id.* ¶ 15. Applying this rule, we determined that the HOA had not waived the antiwaiver provision "because the failure to insist on performance after breach is entirely consistent with the rights set out in the antiwaiver provision—rights of flexibility that often benefit the otherwise-breaching party." *Id.* ¶ 24. We concluded that a finding of waiver in such circumstances would thus "render the antiwaiver provision meaningless." *Id.* Indeed, the contract explained that the precise conduct which Mounteer claimed was a waiver could not be construed as such. *Id.* ¶ 6. So the HOA's failure to insist on Mounteer's performance was "entirely compatible with the antiwaiver clause." *Id.* ¶ 26.

¶29 We went on to explain that an *express waiver* was sufficient to waive both "the underlying provision and the antiwaiver provision." *Id.* ¶¶ 4, 23, 25. And we cited to *Calhoun* for this proposition. *Id.* ¶ 23. We also distinguished the HOA's failure to act from a party's affirmative conduct, which "can be viewed as sufficient to establish a reasonable basis for the conclusion that a party intends to . . . waive[] the antiwaiver provision[]." *Id.* ¶ 28; *see also ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, ¶ 34, 245 P.3d 184 (determining that the defendant's active participation in litigation waived the parties' contractual arbitration agreement).

¶30 Accordingly, *Mounteer* did not diminish *Calhoun*'s holding that an express oral waiver suffices to waive both the underlying provision and the antiwaiver provision of a contract, even when the contract contains an additional requirement that waivers must be in writing. *Mounteer*, 2018 UT 23, ¶ 23. And we reaffirm this holding today. Further, affirmative conduct may be

sufficient to establish a party's intent to waive an antiwaiver provision and, by extension, a written waiver requirement. *See id.* ¶ 28.

¶31 LifeVantage argues that, in the presence of a written waiver requirement, validation of an express oral waiver violates our conclusion in *Mounteer* that "if the specific language of the antiwaiver clause expressly precludes parties from construing certain conduct as a waiver of contractual rights, courts must enforce this provision as part of the parties' agreement." *Id.* ¶ 19. We agree that in the face of an antiwaiver provision, "a party cannot waive a contractual right merely by failing to enforce the provision establishing that right." *Id.*

¶32 But that is not what AL-IN alleges. AL-IN alleged in its complaint that Dixon approached the CEO, Vice President of Sales, and Chief Compliance Officer of LifeVantage to discuss how he could acquire an ownership interest in Distributorship 101987 as a member of AL-IN and remain in compliance with the P&Ps. He offered to relinquish his personal distributorship so that he would have an ownership interest in only one distributorship. But he was told expressly that he did not need to do so. Further, he was told that to effectuate his joint ownership of Distributorship 101987—notably, the second distributorship in which he would own an interest—he and Ray need only complete a Distributor Name Change Form. Importantly, he was not told that before he could own an interest in two distributorships, he needed to obtain a written waiver from an authorized officer of the company.[3]

¶33 This is unlike the "failure to insist on performance after breach" in *Mounteer*—which we found to be "entirely consistent with the rights set out in the antiwaiver provision." *Id.* ¶ 24. Here, AL-IN alleges that LifeVantage officers expressly told Dixon he did not need to give up his personal distributorship in order to obtain an interest in a second distributorship. In other words, AL-IN alleges that the LifeVantage officers did not merely fail to enforce the individual distributorship provision. Instead, AL-IN's complaint says the officers expressly told Dixon he could hold an

---

[3] AL-IN alleged additional affirmative conduct in accord with these facts.

interest in two distributorships without mention of a written waiver.

¶34 Accordingly, the district court correctly determined that AL-IN alleged sufficient facts to survive a motion to dismiss. And LifeVantage has not persuaded us that there is a plausible basis to reverse the district court.

## CONCLUSION

¶35 Parties to a contract may choose to waive any provision of the contract. However, the party alleging waiver must show that the other party intentionally waived both the underlying provision and any applicable antiwaiver provisions. Here, the district court correctly denied LifeVantage's motion to dismiss AL-IN's breach of contract and declaratory judgment claims because AL-IN's complaint alleged facts that, taken as true, were sufficient to infer that LifeVantage waived the individual distributorship provision, the antiwaiver provision, and the written waiver requirement.

¶36 We affirm.

_____