2025 UT App 167

# THE UTAH COURT OF APPEALS

WALTER PERA, RYAN PERA, AND ALLEN TRENT HAMBLIN,
Appellees,
*v.*
GLIDE TRANSPORTATION CO., GEORGE GOATES, AND KATIE GOATES,
Appellants.

Opinion
No. 20240221-CA
Filed November 20, 2025

Third District Court, Salt Lake Department
The Honorable Andrew H. Stone
No. 220900778

John A. Snow and Alan S. Mouritsen,
Attorneys for Appellants

Brandon T. Crowther, Attorney for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1 George Goates, Katie Goates, and Glide Transportation Co. (collectively, Buyers) entered into a purchase agreement with Walter Pera, Ryan Pera, and Allen Hamblin (collectively, Sellers) to purchase a company. As part of this transaction, Buyers signed two promissory notes that set out payment schedules for future payments.

¶2 Under a set of circumstances described below, Buyers later made a series of payments that were either late or lower than the amount set forth in the promissory notes. Sellers subsequently sued, alleging breach of contract and breach of the covenant of good faith and fair dealing, and they also claimed that Buyers' payments were subject to a higher default interest rate that was set forth in the promissory notes. In response, Buyers asserted that

Sellers had waived their right to apply the default interest rate or, alternatively, that they should be equitably estopped from doing so. Buyers also claimed that they were entitled to an offset due to a tax problem. Following a bench trial, the district court ruled in favor of Sellers on the waiver and equitable estoppel issues, and it further ruled that Buyers had not proven that they were damaged by the alleged tax problem.

¶3     Buyers now appeal. For the reasons set forth below, we first conclude that the district court committed legal error when it rejected Buyers' waiver and equitable estoppel defenses, so we remand for further consideration of those issues. Next, we affirm the court's conclusion that Buyers did not prove any damages relating to the alleged tax problem.

## BACKGROUND[1]

### The Contract

¶4     In March 2016, Buyers and Sellers entered into a contract (the Contract) under which Buyers agreed to purchase RTW Management, LLC (the Company). During negotiations, Sellers hired a broker to help set the purchase price, and Sellers gave the broker access to the Company's finances and information. The parties eventually agreed to a purchase price of $2.5 million, with $2 million paid up front and $500,000 to be paid under a payment plan that was set forth in two promissory notes. Each of the three Buyers signed individual and substantively identical promissory notes.

---

1. "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings; we present additional evidence only as necessary to understand the issues on appeal." *State v. Sparling*, 2024 UT App 59, n.1, 549 P.3d 86 (quotation simplified), *cert. denied*, 554 P.3d 1096 (Utah 2024).

¶5     Under the first promissory note (which was titled and will be referred to here as Note One), the three Buyers each agreed to pay a principal sum of $128,333 in quarterly payments of $8,420, and those payments were due on the "18th day of every third month" beginning two years after closing. Buyers also agreed to pay interest at a rate of 6% per annum. Payments under the second promissory note (which was titled and will be referred to here as Note Two) were to be paid in increments of $1,687. Those payments were due on "the 18th day of every third month with the first payment being due June 18, 2016," again with an interest rate of 6% per annum, and the total principal amount that was due per buyer under Note Two was $38,333.

¶6     Each note contained a default interest provision stating that, after a "failure to make any payment, any unpaid principal shall accrue interest" at the rate of 21% per annum. Each note also contained a nonwaiver provision stating that "[n]o failure or delay by [Sellers] in exercising [Sellers'] rights under this Note shall be a waiver of such rights."

¶7     Finally, the Contract included a provision (the Offset Provision) that allowed Buyers to claim an offset against Sellers. That provision stated,

> Buyer[s] shall have the right, but not the obligation, to set off and apply against the [notes] the amount of any claims arising from Sellers' breach of any provisions of this [Contract]. Prior to setting off the amount of any claims made by Buyer[s] against Sellers, Buyer[s] shall provide Sellers written notice of [their] intent to set off such amounts. Buyer[s] must be able to document the breach and provide proof of the damages and the amount, which [Sellers] shall have the opportunity to dispute and/or resolve.

*Buyers' Initial Late Payments*

¶8     As noted, Buyers were required to make their first payment on Note Two on June 18, 2016. When that deadline passed without payment, Sellers contacted Buyers and reminded them that the payment was "due on the 18th of June."[2] Buyers responded, "Since we closed on the first, I have it scheduled . . . to go out on the 30th and be in your accounts on the first and planned to do that every three months. Let me know if this is OK with you?" Sellers did not directly respond to this email, and Buyers made their first payment on July 1, 2016. Buyers subsequently made numerous other late payments under Note Two. Out of the twenty-two payments that Buyers ultimately made pursuant to Note Two over the course of nearly five and a half years, seventeen were late. In January 2018, Sellers sent an email to Buyers about a payment they missed on Note Two in December 2017, stating, "As of today, the payment has not been received, and I could declare you in default."

¶9     On March 12, 2018, Sellers emailed Buyers informing them that, in their view, payments on Note One (which, as indicated, were subject to an initial two-year deferral) would be "due on the 18th." Buyers responded, "Thanks for the reminder. Except for the last payment I was late on, I pay just before the end of the month. We may have signed some paperwork mid-month, but we closed on the [C]ontract at the end of March, so if it is OK with you guys, I'll keep that end-of-quarter payment schedule." Buyers

---

2. As explained above, there were three Buyers and three Sellers, and each side acted collectively in their transactions and dealings with the other. Most of the communications we discuss from this point forward were between individuals—usually (though not always) Walter Pera and George Goates, who seem to have acted as the primary spokespersons for the two sides. For narrative ease, we'll continue to refer to the communications collectively (i.e., as occurring between Buyers and Sellers), though we won't change the first-person pronouns that were sometimes used within the individual communications.

made their first payment on Note One on March 30, 2018. Sellers replied to the March 12 email three months later, stating, "[T]he payment date for the notes is on the 18th. If you choose to pay . . . after that date, then it is considered late."

*Buyers Claim an Offset and Continue Making Late Payments*

¶10 On March 27, 2018—which, as noted, was shortly before they made their first payment on Note One—Buyers sent Sellers an email claiming that they were "entitled to offset . . . damages" due to an alleged issue they had discovered with the Company's finances. Buyers said that they had recently concluded that Sellers had not paid $29,516 that they believed was owed in taxes and workers' compensation premiums in 2015. (For simplicity, we'll typically refer to this as a "tax problem" moving forward.) Buyers asserted that this had allowed Sellers to artificially inflate the value of the Company by that same amount during negotiations. Buyers then asserted that because they had used a multiple of 3.91 times cash flow to value the Company, they had overpaid and the sales price should have been $115,407 lower. Invoking the Offset Provision from the contract, Buyers then claimed that this alleged tax problem constituted a breach of the Contract, and they accordingly asserted that they were entitled to now reduce their quarterly payments on Note One to offset these damages. Buyers included a revised amortization schedule that reflected what they believed they owed and should now pay, and acting pursuant to that schedule, Buyers unilaterally reduced their quarterly payments on Note One from $8,420 to $5,809.17.

¶11 Through counsel, Sellers responded to Buyers' email on May 4, 2018. Sellers first denied that they even owed the claimed taxes and premiums, and they then asserted that, in any event, Buyers' claimed damages were "merely hypothetical." Sellers stated that while they would "apply [Buyers' partial] payment, and any future partial payments," they did "not thereby waive the right to full and complete payment, . . . as well as any other rights or remedies" they might have under the Contract.

¶12   Beginning March 30, 2018, Buyers paid $5,809.17 in quarterly payments on Note One, and they paid that amount for each payment. As they had done with Note Two, Buyers also made several late payments on Note One. Out of the fifteen payments that they ultimately made on Note One, eleven were late.

¶13   In September 2018, after receiving a late payment on Note One, Sellers emailed Buyers the following:

> [P]lease be advised that the monthly amount due on [Note One] is $8,420.39, and the amount received is short $2,611.22. I would like to point out the payment of $5,809.17 was received one day late, on September 19, 2018. While I will apply the partial payment to the balance due on [Note One], I do not thereby waive your obligation to pay the full amount due by the deadline of [the] 18[th] day of the quarter due, or waive any fees, penalties, rights, or claims of any kind related to failure to pay the full amount due.

¶14   This email marked the beginning of a string of similar emails Sellers sent to Buyers over the span of three years reminding Buyers about the payment due dates, inquiring about Buyers' late payments, and reiterating that Sellers' acceptance of any late or partial payments did not waive Buyers' obligation to make timely and full payments or Sellers' ability to assess "fees, penalties, rights, or claims of any kind."

¶15   On October 21, 2020, Sellers sent yet another email to Buyers accepting their late payment on Note Two and their partial and late payment on Note One. This time, they closed the email by stating, "With this notice I am declaring that your loans are and have been in default with default interest being applied." A year later, Sellers emailed Buyers about a late payment and warned them, "If there isn't a payment in my account by the close of business on October 18, 2021[,] I will be forced into going on

another route. You are in default." Buyers stopped making payments on both notes in October 2021.

*The Litigation*

¶16   Sellers filed suit against Buyers in February 2022, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. In their answer, Buyers asserted several affirmative defenses, including "promissory estoppel and/or equitable estoppel," as well as "waiver, release, laches, and unclean hands." In addition, again referencing the tax problem, Buyers claimed that Sellers had "provid[ed] materially misleading and inaccurate financial statements and tax returns," and they accordingly asserted that they were entitled to offset the amounts owed by the amount of the claimed tax obligations.

¶17   The case went to a two-day bench trial in October 2023. All three Sellers and one of the Buyers testified at trial.

¶18   During trial, the issue of waiver was repeatedly discussed in testimony and argument. On redirect examination of Walter Pera (who, as noted, was one of the Sellers), for example, the following exchange occurred between Pera and Sellers' counsel:

> Q. [N]ote [O]ne has a waiver of presentment; correct?
>
> A. That is correct.
>
> Q. And a non-waiver provision; is that correct?
>
> A. That is correct.
>
> Q. Okay. And . . . did you ever tell [Buyers] that you were waiving either of these provisions?
>
> A. No.

> Q. Did you ever tell [Buyers] that you were waiving your right to be paid on the 18th of the month?
>
> A. No.
>
> Q. Did you ever tell [them] you were waiving your right to be paid the full amount without an offset?
>
> A. No.

¶19 On another occasion, Sellers' counsel cross-examined George Goates, who was one of the Buyers, about the waiver issue, during which the following exchange occurred:

> Q. [D]id [Sellers] ever state to you that they were waiving their right to be paid on the 18th?
>
> A. No, they didn't waive their—they didn't state that they waive their right to be paid on the 18th, no.
>
> Q. Did they ever state to you that they were waiving this nonwaiver provision in the promissory notes?
>
> A. I mean that's not kind of how people talk in the course of business, but—
>
> Q. Sure, sure, I understand. So they did not is the answer?
>
> A. That's correct.

¶20 During closing arguments, Buyers asserted both waiver and estoppel. At one point, for example, their counsel stated,

> At a minimum, [Sellers] waive[d] their right to charge default interest from June 2016 through January of 2018 by failing to charge it. And the Court[] should estop [Sellers] from charging default

> interest from . . . January 2018 through October 2020, because they said they could declare [Buyers] in default but never did.

¶21  In addition to waiver and estoppel, the parties also litigated the question of whether Buyers were entitled to claim an offset based on the tax problem. On direct examination, George Goates (who, again, was one of the Buyers) testified that Buyers had valued the Company at the multiple of 3.91 times the "cash flow." When Buyers' counsel asked Goates to explain "how [he] came to have an understanding about the basis for the offset," Sellers' counsel objected. Sellers' counsel asserted that while Goates could testify about "his understanding" of the multiple, any testimony about the ramifications of this on "a tax question" could only be provided by "an expert witness." In response, Buyers' counsel asserted that they did not need a tax expert "to opine on the law" relating to tax obligations. Resolving the objection, the district court stated, "I don't think I buy into the notion that every question on law is outside the realm of experts." But it then observed that "[t]ax, in particular[,] is often a subject . . . [that is] typically presented through expert testimony." With respect to Goates, however, the court ruled that he could "talk about what he came to understand." In subsequent testimony, Goates testified that he had personally "created" the 3.91 multiple and that Buyers had subsequently used it to calculate the offset they were allegedly entitled to, but he also admitted that he didn't "recall where [he] came up" with the 3.91 number. In the course of their case, Buyers did not subsequently call an expert to discuss the issue of whether Sellers owed the alleged taxes and premiums.

¶22  At the close of trial, the district court issued a written ruling in Sellers' favor. The court concluded that Buyers had breached the Contract by making late payments on Note Two, as well as by

under-paying on Note One.[3] The court further concluded that Sellers were entitled to damages and that those damages included interest at the higher default interest rate.

¶23     In its ruling, the court rejected Buyers' assertion that Sellers had either waived or should be estopped from seeking damages based on Buyers' late or reduced payments. Addressing these issues, the court's full ruling was as follows:

> This case is governed entirely by the written documents. The parties did not strictly adhere to their writings, but in the absence of mistake or modification, the written documents and their terms control. The parties are all business people and they are capable of reading these documents just as they are capable of providing amortization schedules and the like. The parties did not consistently apply the terms of [Note One], but it is the written terms that control here.
>
> The parties are at arms' length, are not fiduciaries to each other, and do not have any independent duty, aside from contractual duties, to

---

3. Although the court agreed that payments on Note One were due on the 18th of each month, it concluded that under various provisions of the Contract, the two-year deferral for Note One meant that the first payment was due on June 18, 2018, not March 18, 2018. As a result, although Buyers had repeatedly paid after the 18th of each month, the court concluded that each of their payments on Note One was "technically early until payments stopped" in October 2021. Thus, with respect to Note One, the court did not conclude that Buyers had breached based on late payments, but it instead only concluded that Buyers had breached based on under-payments.

provide notice to the other parties as to their legal positions regarding payments under [Note One].

The Court does not believe that there is any evidence to support that [Sellers] had a scheme to lure [Buyers] into a default position or to exploit [Buyers] to obtain more for [the Company] than they were promised.

¶24 Finally, on the question of whether Buyers were entitled to an offset based on the tax problem, the court rejected Buyers' claim on two grounds. First, the court ruled that the question of whether Sellers actually owed the taxes or premiums was "a matter for expert testimony," and it then ruled that because Buyers had not called an expert, they had not carried their burden on this issue. Second, the court ruled that, even setting the expert witness problem aside, Buyers had failed to show that they had been damaged by Sellers' alleged failure to pay the taxes or premiums. The court observed that although "multiples" can be used to value a company, they "are not set in stone," and it further observed that the 3.91 multiple that was asserted here did "not necessarily control the value of" the Company. To the contrary, the court viewed this as a "unilateral valuation method" belatedly asserted by Buyers, or, in other words, as a "back door way of valuing" the Company. Absent additional proof, it concluded that Buyers had not carried their burden of proving damages.

ISSUES AND STANDARDS OF REVIEW

¶25 On appeal, Buyers first argue that the district court erred in concluding that the doctrines of waiver and estoppel did not apply to this case. "Whether a contractual right has been waived presents a mixed question of law and fact," and "whether the trial court employed the proper standard of waiver presents a legal question which is reviewed for correctness." *Neeshan v. Ravonsheed*, 2024 UT App 175, ¶ 10, 561 P.3d 708 (quotation simplified). "The actions or events allegedly supporting waiver

are factual in nature and should be reviewed as factual determinations, to which we give a trial court deference." *Id.* (quotation simplified). "The issue of whether equitable estoppel has been proven is a classic mixed question of fact and law," and when reviewing such a claim, "we grant the district court's decision a fair degree of deference when we review whether the requirements of the law of estoppel have been satisfied." *South Weber City v. Cobblestone Resort LLC*, 2022 UT App 63, ¶ 14, 511 P.3d 1207 (quotation simplified).[4]

¶26 Buyers next argue that the district court erred in concluding that they were not entitled to an offset. "Whether a

---

4. As noted, Buyers asserted both equitable estoppel and promissory estoppel below. In their appellate briefs, however, they repeatedly refer to "estoppel" without any qualifier. Reviewing their briefing, we note that in their procedural history, Buyers say that they raised the "affirmative defenses of equitable estoppel and waiver" below, but they make no mention of promissory estoppel anywhere in their opening or reply briefs. Moreover, in their arguments, Buyers repeatedly cite and discuss a treatise that is focused on principles of equitable estoppel, but they make no similar arguments about promissory estoppel.

Our supreme court has explained that "equitable estoppel and promissory estoppel" are "distinct legal principles," with equitable estoppel acting as "a defense," and promissory estoppel acting as a "cause of action in most instances." *Youngblood v. Auto-Owners Ins. Co.*, 2007 UT 28, ¶ 12, 158 P.3d 1088. In this sense, "promissory estoppel is a sword, and equitable estoppel is a shield." *Id.* ¶ 19 (quotation simplified).

Buyers were the defendants in the case below—they're being sued for breach of contract—and they raised their estoppel theories as a defense to Sellers' claims. In light of both the nature of their appellate briefing and the nature of the two doctrines, we understand Buyers to now only be attacking the court's rejection of their equitable estoppel defense. Moving forward, we'll thus only consider whether the district court erred in rejecting Buyers' equitable estoppel defense.

party performed under a contract or breached a contract is a question of fact, and the district court's fact findings enjoy a high degree of deference and will be overturned only when clearly erroneous." *Globe Contracting LLC v. Hour*, 2025 UT App 98, ¶ 32, 575 P.3d 235 (quotation simplified).

ANALYSIS

## I. Waiver and Equitable Estoppel

¶27 Much of the litigation below was focused on whether the doctrines of waiver or equitable estoppel applied in this case. At the close of the bench trial, the district court rejected Buyers' waiver and equitable estoppel claims, concluding that "[t]his case is governed entirely by the written documents" and that "the written terms" of those documents therefore "control." As we understand it, the court's view was that because the parties had agreed to a written contract, and because there had been no express modification of that contract, these doctrines could not provide Buyers with the requested relief. We disagree with the court's view of how these doctrines operate in contexts such as this one.

¶28 The district court was entirely correct to note that Buyers were invoking the doctrines of waiver and equitable estoppel against the backdrop of a valid contract. But unlike the district court, we don't believe that the existence of that contract settles the question of whether these doctrines could apply. To the contrary, when these doctrines are invoked in a situation like this one, they each presuppose that there *is* an outstanding contractual obligation, but the question then becomes whether something else has happened that should now prevent one party from enforcing its rights under that contract.

¶29 With regard to waiver, for example, we recently explained that "waiver is an intentional relinquishment of a *known right*," and we further explained that "to constitute waiver, there must

be an *existing right*, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *Neeshan v. Ravonsheed*, 2024 UT App 175, ¶ 12, 561 P.3d 708 (emphases added, quotation otherwise simplified). In this sense, the waiver doctrine presupposes that there was indeed "a right"—which could, of course, be created by contract—and the question then becomes whether one party has somehow relinquished its right to enforce that right. *See, e.g., id.; see also Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 17, 422 P.3d 809 ("A party may establish waiver only where there is an intentional relinquishment of a known right." (quotation simplified)). As a result, and contrary to the conclusion of the district court, we conclude that the existence of a written contract in this case did not foreclose the potential applicability of the waiver doctrine.

¶30 So too with respect to equitable estoppel. Our supreme court has recognized that "equitable estoppel can be a defense to a contract claim," though it requires proof of several "elements unrelated to the elements of contract." *Howick v. Salt Lake City Corp.*, 2018 UT 20, ¶ 14, 424 P.3d 841. "Equitable estoppel reflects circumstances where it is not fair for a party to represent facts to be one way to get the other *to agree*, and then change positions *later* to the other's detriment." *Youngblood v. Auto-Owners Ins. Co.*, 2007 UT 28, ¶ 15, 158 P.3d 1088 (emphases added). In *Iota, LLC v. Davco Management Co.*, for example, we considered an appeal in which the defendant in a breach of contract case had asserted, as a defense, that the plaintiff's conduct satisfied the elements of equitable estoppel. *See* 2012 UT App 218, ¶¶ 2–9, 26–30, 284 P.3d 681. Thus, contrary to the view of the district court, the existence of a contract alone did not prevent Buyers from asserting equitable estoppel as a defense to Sellers' breach of contract claims.

¶31 This leaves the question of what to do next. Because the district court concluded that these doctrines were unavailable to Buyers as a matter of law, the court did not then resolve any factual questions relating to these doctrines. But controlling

caselaw has made it clear that both doctrines turn, in no small measure, on factual determinations.

¶32    With respect to waiver, for example, we recently held that for both express and implied waiver, "the intent to relinquish a right must be distinct." *Neeshan*, 2024 UT App 175, ¶ 13 (quotation simplified). This requirement of distinctness "ensures that waiver will not be found from any particular set of facts unless it was clearly intended." *Id.* (quotation simplified). Of some note, we held that "the intent question is intensely fact dependent, turning on whether the totality of the circumstances warrants the inference of relinquishment." *Id.* (quotation simplified). What's more, in the face of an antiwaiver clause (such as was present in this case), the party asserting waiver "must establish a clear intent to waive both the antiwaiver clause and the underlying contract provision." *Mounteer*, 2018 UT 23, ¶ 21 (quotation simplified); *see also AL-IN Partners, LLC v. LifeVantage Corp.*, 2021 UT 42, ¶ 28, 496 P.3d 76. In considering that question, a court may find that "affirmative conduct" from a party was "sufficient to establish a party's intent to waive an antiwaiver provision and, by extension, a written waiver requirement." *AL-IN Partners*, 2021 UT 42, ¶ 30.

¶33    With respect to equitable estoppel, the question of whether it "has been proven is a classic mixed question of fact and law." *South Weber City v. Cobblestone Resort LLC*, 2022 UT App 63, ¶ 14, 511 P.3d 1207 (quotation simplified). We've recognized that equitable estoppel "is highly fact-sensitive." *Atlas Van Lines, Inc. v. Dinosaur Museum*, 2016 UT App 30, ¶ 10, 368 P.3d 121 (quotation simplified). And we've further recognized that "the fact-intensive nature" of this doctrine is the very reason that appellate courts grant the district court "broader discretion in applying the law to the facts" when ruling on equitable estoppel claims. *Volonte v. Domo, Inc.*, 2023 UT App 25, ¶ 28, 528 P.3d 327 (quotation simplified).

¶34    For example, one of the elements of equitable estoppel is reasonable reliance. *See, e.g., Fitzgerald v. Spearhead Invs., LLC*, 2021 UT 34, ¶ 18, 493 P.3d 644. And "reasonable reliance is generally a

factual matter within the province of the finder of fact." *Co-Diagnostics Inc. v. HuKui Tech. Inc.*, 2025 UT App 74, ¶ 27, 571 P.3d 1178 (quotation simplified); *see also Timothy v. Keetch*, 2011 UT App 104, ¶ 10, 251 P.3d 848 (noting that "reasonable reliance is generally a factual matter, within the province of the finder of fact," though also noting that "in some cases it can be decided as a matter of law"). Moreover, equitable estoppel also requires a showing of prejudice or harm. *See, e.g.*, *UMIA Ins., v. Saltz*, 2022 UT 21, ¶ 37, 515 P.3d 406; *Mounteer*, 2018 UT 23, ¶ 33. This, too, would naturally contemplate some fact finding by a district court.

¶35　As discussed, however, we have no findings from the district court relating to the various factual questions that are implicated by these two doctrines. And "without adequate findings of fact, there can be no meaningful appellate review." *Anderson v. Thompson*, 2008 UT App 3, ¶ 42, 176 P.3d 464 (quotation simplified). In this sense, we "are mindful that we are a court of review, not of first view." *Richmond v. Bateman*, 2024 UT App 103, ¶ 31, 554 P.3d 341 (quotation simplified). Given all this, because the district court's rejection of these claims was based on a legal error, and because the court did not resolve pending factual questions relating to these two doctrines and then consider the legal standards in light of those findings, we have no basis for ruling on these doctrines either way. We accordingly remand with instructions for the district court to determine in the first instance whether waiver and equitable estoppel apply. Because the matter already went to trial, the court should rely upon the evidence that was previously submitted in making its factual findings and legal conclusions on these two doctrines, and neither party should be permitted to submit any additional evidence.

## II. Offset

¶36　As noted, Buyers claimed that Sellers "provid[ed] materially misleading and inaccurate financial statements and tax returns" relating to alleged tax and workers' compensation obligations. They then claimed that this triggered a provision in the Contract that allowed them to claim an offset if Sellers had

"breach[ed]" "any provisions" of the Contract. They accordingly claimed that they were entitled to an offset that would reduce their obligations. The district court rejected this claim on two grounds: first, it concluded that expert testimony was required on this issue, and second, it concluded that Buyers had not proven damages. Because we agree with the district court on the second ground, we need not consider the first.

¶37 "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Richards v. Cook*, 2013 UT App 250, ¶ 7, 314 P.3d 1040 (quotation simplified). A party that is asserting breach "is required to prove both the fact of damages and the amount of damages." *Stevens-Henager College v. Eagle Gate College*, 2011 UT App 37, ¶ 16, 248 P.3d 1025. "To prove the amount of damages, the plaintiff must produce evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages." *Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2013 UT App 146, ¶ 13, 305 P.3d 171 (quotation simplified). A party therefore "has the burden to produce a sufficient evidentiary basis to establish the fact of damages and to permit the trier of fact to determine with reasonable certainty the amount of those damages." *Stevens-Henager*, 2011 UT App 37, ¶ 16 (quotation simplified). Indeed, this well-established legal burden was reflected in the Offset Provision of the Contract itself, which specifically required Buyers to provide "proof of the damages and the amount" in order to claim an offset.

¶38 Under the circumstances of this case, Buyers could in theory have claimed that the IRS had alerted them to the tax problem and demanded payment—and, thus, that they were damaged because of an unexpected tax bill. But Buyers never asserted that the IRS had ever tried collecting on these amounts. Instead, what Buyers asserted was that the sales price for the Company was based on a 3.91 multiple applied to the Company's cash flow. In Buyers' view, because Sellers had failed to pay the required taxes and premiums, Sellers had essentially

overreported their cash flow during negotiations—and, thus, that Sellers had obtained a higher sales price than was warranted.

¶39    But in addressing and rejecting this claim, the district court found that Buyers had not carried their burden of proving that they were damaged in this regard. The court found that multiples are highly variable and "are not set in stone," and the court further found that there was "no testimony" establishing that the 3.91 multiple pointed to by Buyers "necessarily control[led]" the valuation of the Company. The court then concluded that Buyers' claim that the sales price was mathematically tied to a multiple of 3.91 times cash flow was an attempt to "re-do the parties' deal," but that on the evidence presented, the court "just [couldn't] find a value that would justify" that damages claim.

¶40    Reviewing the record, we see ample evidence that backed up the court's ruling. At trial, Walter Pera, one of the Sellers, testified that the purchase price of $2.5 million was determined by Sellers' hired broker based on "a lot of due diligence," and Pera further testified that it was not "tied to any multiple of earnings." Additionally, George Goates, one of the Buyers, testified that he "created" the 3.91 multiple but that he didn't "recall where [he] came up" with that number. Of particular note, Goates admitted that Sellers "never agreed to value the business based on that multiple." Finally, Pera testified that Sellers simply weren't "willing to sell for less than the $2.5 million," thus suggesting that from their end, the sales price was not tied to any particular valuation based on the 3.91 multiplier times cash flow.

¶41    Given this, we see no basis for overturning the district court's determination that Buyers had failed to prove they were actually damaged by the alleged tax problem. As a result, we affirm the court's rejection of Buyers' claim that they were entitled to an offset.

CONCLUSION

¶42     We reverse the district court's conclusion that Buyers were not entitled to assert waiver or equitable estoppel, and we remand with directions for the court to resolve those issues in the first instance based on the evidence presented at trial. We affirm the court's decision that Buyers were not entitled to an offset.

———————