2026 UT App 54

# THE UTAH COURT OF APPEALS

COOK MARTIN POULSON PC,
Appellee,
*v.*
DANIEL G. SMITH,
Appellant.

Opinion
No. 20230024-CA
Filed April 9, 2026

Second District Court, Ogden Department
The Honorable Brandon J. Maynard
The Honorable Cristina P. Ortega
No. 220903740

Troy L. Booher, Beth E. Kennedy, and
Russell S. Walker, Attorneys for Appellant

Thomas J. Burns and Aaron R. Harris,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

LUTHY, Judge:

¶1     This case centers on the relationship between Daniel G. Smith, an accountant, and Cook Martin Poulson PC (CMP), the accounting firm for which he once worked and of which he was (and may still be) a shareholder. CMP sued Smith, and Smith filed counterclaims against CMP. Smith also filed a third-party complaint against CMP's other shareholders (the Other Shareholders). The case now comes to us on appeal for the third time. *See Cook Martin Poulson PC v. Smith*, 2020 UT App 57, 464 P.3d 541 (*Smith I*); *Cook Martin Poulson PC v. Smith*, 2021 UT App 60, 493 P.3d 698 (*Smith II*).

¶2 In this appeal, Smith challenges the district court's dismissal of his third-party complaint against the Other Shareholders as a discovery sanction under rule 37 of the Utah Rules of Civil Procedure. He also challenges the district court's grant of summary judgment in favor of CMP on CMP's claims against Smith for breach of an employment agreement, breach of a shareholders agreement, and related declaratory relief. As part of its summary judgment ruling, the court determined that because Smith failed to produce initial disclosures during the discovery period, he was barred under rule 26 of the Utah Rules of Civil Procedure from presenting any evidence. Smith challenges that ruling as well.

¶3 We conclude that the district court exceeded its discretion by dismissing Smith's third-party complaint against the Other Shareholders as a rule 37 discovery sanction, because the Other Shareholders did not move for rule 37 sanctions. We determine that the court again exceeded its discretion when it barred Smith under rule 26 from presenting his own declarations and a spreadsheet as evidence, because Smith's failure to disclose himself as a potential witness and the spreadsheet as potential evidence was harmless. We further conclude that when Smith's declarations and the spreadsheet are considered, CMP was not entitled to summary judgment on its claim against Smith for breach of the employment agreement. And we likewise conclude that CMP was not entitled to a declaration on summary judgment that it had already purchased Smith's shares. On the other hand, we affirm the district court's grant of summary judgment in favor of CMP on its claim against Smith for breach of the noncompete provision in Article 9.01 of the shareholders agreement because Smith does not challenge that ruling on appeal. Accordingly, we affirm in part, reverse in part, and remand this matter for additional proceedings consistent with this opinion.

BACKGROUND[1]

*The Terms of Smith's Employment Agreement with CMP*

¶4　Smith began working as an accountant for CMP in 1995. Each year through 2004, he signed an employment agreement. The 2004 agreement (the Employment Agreement) stated that Smith would be paid "as compensation for services the sum of $5,200 per month ($62,400 on an annual basis)." The Employment Agreement permitted Smith's termination if he failed "to faithfully [and] diligently perform the duties of his employment." It also included a noncompete provision prohibiting Smith— during his employment with CMP and for a period of two years following his termination—from providing "accounting services to any client for whom [CMP had] performed accounting services during the twelve-month period immediately preceding the termination of [Smith's] employment." The Employment Agreement further provided that in the event Smith breached the noncompete provision, CMP would be entitled to liquidated damages equal to 150% of what it had billed—during the twelve-month period immediately preceding Smith's termination—the clients to whom Smith provided services in violation of the noncompete provision.

*The Terms of the CMP Shareholders Agreement*

¶5　In 2005, Smith became one of five shareholders in CMP, pursuant to a shareholders agreement (the Shareholders Agreement). Article 2.05 of the Shareholders Agreement, titled "Pro Rata Participation in Dividends," provided,

---

1. Portions of this Background section are borrowed verbatim, or essentially so, from the Background sections of *Smith I*, 2020 UT App 57, 464 P.3d 541, and *Smith II*, 2021 UT App 60, 493 P.3d 698, without further attribution.

> Dividends and other forms of distributions from [CMP] (whether involving share, cash or other property) shall be made pro-rata (when considered on an annual basis) with respect to each share of capital stock of [CMP] held by Shareholders so that all Shareholders will participate in proportion to the number of [CMP's] shares then held by Shareholders.

Article 2.06 of the Shareholders Agreement contained a clause titled "Salary," which stated, "So long as a Shareholder is actively engaged in the business either in the form of an employee or pursuant to another agreed to relationship, the Shareholder shall be entitled to an annual salary from [CMP] in an amount as determined by the majority of the Shareholders." Article 9.01 of the Shareholders Agreement included a noncompete clause in which each shareholder agreed to not "provide accounting services" for two years following termination of employment with CMP to any client for whom CMP or the shareholder had "performed accounting services during the five year period immediately preceding" termination of the shareholder's employment.

¶6 Additionally, Article 5.01 of the Shareholders Agreement granted CMP the "right to purchase" a shareholder's shares if the shareholder "engage[d] in one or more acts that in the unanimous opinion of the remaining Shareholders, [were] discreditable." Article 7.03 of the Shareholders Agreement outlined how the value of the shares would be calculated as well as the manner and timeframe in which the buyout would be paid. As to the manner and timeframe for accomplishing such a buyout, Article 7.03 provided that CMP's purchase of a shareholder's shares following a discreditable-acts determination would take the form of 120 monthly installment payments beginning one year after CMP exercised its right to purchase the shares. Finally, Article 7.03 provided that if a shareholder "perform[ed] any services for

clients of [CMP], which client list [would] be determined as of the date of the sale, during the five year period following [CMP] giving the selling Shareholder notice of [its] intent" to buy back the shareholder's shares, then "the balance remaining on the note payable" for the buyout would "be deemed paid in full" and CMP would "have no further obligation" to that shareholder.

*CMP Terminates Smith's Employment, and the Other Shareholders Determine that Smith Engaged in Discreditable Acts*

¶7    In July 2014, CMP terminated Smith's employment for "failure to diligently perform the duties of [his] employment despite repeated requests for improvement." Subsequently, in December 2014, the Other Shareholders unanimously determined that Smith had engaged in "discreditable acts" under the Shareholders Agreement. On December 12, 2014, they notified Smith of this determination and informed him that they had "elected to repurchase [his] shares" under the relevant provisions of the Shareholders Agreement. They also informed Smith that they based their discreditable-acts determination on, among other things, the fact that "[f]ollowing his termination as an employee of CMP, [Smith had] engaged with CMP clients, in violation of the non-compete, non-solicitation provisions of the Shareholders Agreement."

*The Lawsuit and the TRO and Preliminary Injunction*

¶8    On December 15, 2014, CMP filed a lawsuit against Smith, alleging causes of action for (1) declaratory relief related to the parties' rights and obligations under the Employment Agreement and the Shareholders Agreement, including a declaration that "CMP is entitled to exercise its option to purchase Smith's shares in CMP under [Article 7.03] of the Shareholders[] Agreement"; (2) breach of the Employment Agreement; (3) breach of the Shareholders Agreement; (4) breach of the implied covenant of good faith and fair dealing; (5) breaches of fiduciary duty; and (6) injunctive relief in the form of a temporary restraining order

(TRO) and injunction prohibiting Smith from providing accounting services to CMP clients and from influencing any CMP clients to terminate their relationship with CMP in violation of the relevant agreements.

¶9    Smith filed an answer, along with counterclaims against CMP and a third-party complaint against the Other Shareholders. Smith based his counterclaims and third-party complaint on allegations that CMP and the Other Shareholders had breached the Employment Agreement and the Shareholders Agreement by improperly reducing Smith's salary and distributions and forcing him out of the company. He further asserted that CMP and the Other Shareholders had unjustly deprived him of his shares in CMP. Smith opposed CMP's claims by contending that CMP had been the first to breach both the Employment Agreement and the Shareholders Agreement, thereby excusing any later breaches by him. Smith did not assert as an affirmative defense to CMP's claim for breach of the Employment Agreement that the Employment Agreement had been abandoned or superseded.

¶10    In response to CMP's request for injunctive relief, the district court issued a TRO and preliminary injunction, which enjoined Smith

> from directly or indirectly, for himself or any third party, soliciting or having any contact with any current client of CMP, or soliciting any person, firm, or corporation who was a customer of CMP within the 12 month period immediately preceding the termination of Smith's employment, with regard to accounting or other services of the type CMP provides.

*The Discovery Dispute*

¶11    The case proceeded to discovery. CMP served Smith with its initial disclosures and an initial set of written discovery

requests. Smith provided no initial disclosures and made no written discovery requests. The Other Shareholders likewise appear to have provided no initial disclosures and to have made no written discovery requests.

¶12 After Smith produced responses to CMP's discovery requests, CMP filed a statement of discovery issues alleging that Smith's responses "were incomplete and evasive." The district court issued an order giving Smith seven days to "respond[] in full to the information requested by" CMP and to "produce all documents . . . responsive to the Requests for Production propounded by" CMP. Smith failed to meet the court-ordered deadline.

¶13 Three days after the deadline, Smith's counsel contacted CMP's counsel and offered to allow CMP's counsel to view the requested documents at Smith's counsel's office on Smith's computer. CMP's counsel noted that the court's deadline had passed and informed Smith's counsel that CMP expected the documents to be provided as ordered. Smith's counsel continued to insist, however, that the documents should be inspected on Smith's computer "as they are kept in the usual course of business." CMP's counsel maintained that the documents should be "produced in hard copy or electronic format," and CMP's counsel requested that Smith's counsel arrange for CMP to "image the hard drive" of Smith's computer. Smith's counsel refused this request.

*Smith Is Sanctioned for Violating the Court's Discovery Order and Allegedly Violating the TRO and Preliminary Injunction*

¶14 CMP filed a motion for an order to show cause, asking the court to sanction Smith and suggesting that those sanctions include "striking Smith's pleadings from the record and entering default in favor of CMP." In the meantime, CMP also received information indicating that Smith had "continued to provide accounting services for several clients of CMP," in violation of the

TRO and the preliminary injunction. Thus, CMP filed another motion for an order to show cause, this one requesting that Smith be held in contempt for his alleged violation of these court orders.

¶15    In response, Smith admitted that he had provided accounting services to over 400 of CMP's former clients, but he insisted that he had not solicited any current CMP client, that he had served only "clients who approached him," and that he had not yet invoiced them. With respect to the production of documents, Smith argued that he could not be held in contempt because he had "repeatedly offered to provide CMP's counsel access to [Smith's] computer" but CMP's counsel had "refused to meet to inspect the information on Smith's computer."

¶16    The court was unimpressed with Smith's excuses. It found that Smith had "blatantly ignored the [c]ourt" and violated both the preliminary injunction and the discovery order. Based on these findings, the court held Smith in contempt and imposed sanctions. Specifically, it ordered Smith's counterclaims stricken and entered CMP's proposed findings of fact. Those findings included, among other things, a determination that Smith had violated the Shareholders Agreement by engaging in the discreditable acts alleged by CMP, that CMP had followed the appropriate protocol outlined in the Employment Agreement in terminating Smith's employment, that Smith had violated the Employment Agreement and the Shareholders Agreement by providing accounting services to CMP clients after his termination, and that Smith's conduct had relieved CMP of any obligation to pay him for his shares. The court then entered final judgment in favor of CMP on its claims against Smith.

¶17    Relying on the findings the district court had entered as a discovery sanction, the Other Shareholders then moved for summary judgment on Smith's claims against them. The court granted their motion, determining that its findings that Smith breached the Employment Agreement and the Shareholders

Agreement precluded Smith's claims against the Other Shareholders.

*The First Appeal*

¶18 Smith appealed to this court, asserting (1) "that the district court erred by finding him in contempt for violating the preliminary injunction and for failing to comply with the court's discovery order," (2) "that the sanctions imposed for his violations were unduly harsh," and (3) "that the district court's default findings were insufficient to support the summary judgments against Smith on CMP's claims and Smith's third-party complaint." *Smith I*, 2020 UT App 57, ¶¶ 16–18, 464 P.3d 541.

¶19 Regarding Smith's alleged violation of the preliminary injunction, we determined that "the plain language of the preliminary injunction order did not prohibit Smith from working for former CMP clients, so long as he did not solicit them"; that while Smith admitted "he performed accounting-related services for former CMP clients," he "consistently maintained that the clients approached him independently and that he 'provided accounting services for certain former CMP clients . . . who approached him to do the work'"; that the "district court did not make a finding that Smith worked for current CMP clients or that he solicited former CMP clients"; and, therefore, that "the district court plainly erred[2] when it determined that Smith's admitted actions violated the terms of the preliminary injunction." *Id.* ¶ 27. We therefore concluded that the district court "exceeded its

---

2. We applied plain error review in *Smith I* "without opining on the propriety of doing so" because CMP had "not challenged the applicability of civil plain error review." 2020 UT App 57, ¶ 22 n.3. We have since held that "unless expressly authorized by rule, [plain error review] does not properly extend to ordinary civil appeals." *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 41, 507 P.3d 357 (cleaned up).

discretion in holding Smith in contempt for violating the preliminary injunction based solely on a finding that he provided accounting services to former clients." *Id.* ¶ 36.

¶20 On the other hand, we determined that the court acted well within its discretion when it held Smith in contempt for violating the discovery order. *See id.* ¶¶ 28–35. However, because there was "no way for [us] to know whether the district court would have employed the same sanction[s] based on the discovery violations alone" and because it was "possible that the court would have entered other sanctions in response to the discovery violation alone," we vacated the sanctions. *Id.* ¶ 36. Additionally, because the district court's entry of "summary judgment was based on the default findings that were imposed as a sanction," we "necessarily also reverse[d] the court's summary judgment rulings." *Id.* ¶ 37. We then remanded for further proceedings consistent with our opinion in that appeal. *See id.* ¶¶ 37, 44.

¶21 In the meantime—while the first appeal was pending—CMP had taken steps to enforce its judgment, and Smith had moved for a stay of execution. In his motion for a stay, Smith asserted that he owned a "current 20% shareholder interest in CMP." CMP responded, claiming, "[L]ong ago CMP repurchased [Smith's shares] from him. He has no shares . . . ." Ultimately, Smith was unable to obtain a stay because he could not post a bond or other security.[3]

---

3. After denying Smith's motion for a stay, the district court ordered Smith not to dispose of his non-exempt property, and it issued a writ of execution. When the sheriff attempted to execute on Smith's non-exempt property, Smith refused to turn some of it over and claimed he no longer had access to some of it. The district court issued two orders holding Smith in contempt for disposing of portions of his property, and Smith appealed from those

(continued…)

*The Proceedings on Remand*

¶22    On remand from the first appeal, CMP asked the district court to "reinstate all of the sanctions that it [had] previously entered against" Smith.[4] In response, the court found that "based on Smith's violation of the [c]ourt's discovery order, . . . it [was] appropriate to reaffirm the striking of Smith's counterclaim [against CMP] and [his] third party complaint" against the Other Shareholders as a discovery sanction under rule 37 of the Utah Rules of Civil Procedure. Apparently because the court had not actually stricken Smith's third-party complaint previously as a sanction but, rather, dismissed it on summary judgment based on CMP's proposed findings of fact that it had entered as a sanction, the court clarified as follows:

> [T]he [c]ourt finds it appropriate to note that Smith did not separate, or otherwise differentiate between, his counterclaims and third party complaint in his *Amended Answer to Complaint, Counterclaim and Third Party Complaint*. Thus, to the extent the [c]ourt previously "order[ed] that [Smith's] Counterclaim be stricken from the record," the [c]ourt finds it appropriate to clarify that the striking of Smith['s] "Counterclaim" also includes the striking of his third party complaint.

¶23    CMP and Smith also filed cross-motions for summary judgment on CMP's causes of action for (1) declaratory relief related to the parties' rights and obligations under the

---

orders—his second appeal in this matter. In the second appeal, we reversed those contempt orders. *See Smith II*, 2021 UT App 60, ¶ 22. The issues raised in the second appeal are not relevant here.

4. By the time the case returned to the district court on remand, a new judge had been assigned to the matter.

Employment Agreement and the Shareholders Agreement, (2) Smith's breach of the Employment Agreement, and (3) Smith's breach of the Shareholders Agreement.

¶24   In support of its motion and in opposition to Smith's, CMP set forth the following—in addition to relevant terms of the Employment Agreement and the Shareholders Agreement—as undisputed facts and supported those facts with citations to material in the record:

- After Smith signed the Employment Agreement and until his termination, "CMP paid a salary to Smith every month" and the salary was "more than the Employment Agreement required."

- CMP terminated Smith's employment and notified him of that termination in July 2014.

- "After CMP terminated [Smith's] employment (and through July 31, 2016), [Smith] continued to perform accounting related and tax services for CMP clients who had been CMP clients during" the twelve-month period immediately prior to Smith's termination.

- In December 2014, after Smith's employment was terminated, the Other Shareholders "voted and unanimously determined that [Smith's] actions were discreditable acts under the terms of the Shareholder[s] Agreement." At the same time, CMP "exercised its option to purchase [Smith's] shares pursuant to [Article] 7.03 of the Shareholders[] Agreement."

- "On December 12, 2014, CMP notified Smith in writing of the [Other Shareholders'] decision that he had engaged in discreditable acts and also [of] the decision for CMP to acquire his shares pursuant to the terms of the Shareholder[s] Agreement."

- Smith "admitted in documents filed with the [c]ourt and in testimony given during the [p]reliminary [i]njunction hearing that he provided accounting related and tax services . . . after CMP terminated him" for people who had been CMP clients during the twelve months prior to his termination.

- "Smith provided CMP with a list of the clients for whom he admitted performing accounting related and tax services after his termination," "approximately 80% of whom had been CMP clients [during] . . . the one year period prior to [Smith's] termination as an employee of CMP."[5]

- CMP "calculated the total billings that it submitted to these clients during the twelve-month period immediately preceding [Smith's] termination," and "that amount [was] $298,903."

Smith disputed only the first of the foregoing factual assertions with citation to evidence in the record. *See infra* ¶ 26.

¶25    CMP argued that under rule 26 of the Utah Rules of Civil Procedure, Smith should be "barred from presenting any evidence" because he "did not serve initial disclosures at any point during the fact discovery period" and his "failure to disclose evidence [as required] under [r]ule 26 [was] not harmless." CMP then contended that based on the facts it had set forth—as outlined above—"[s]ummary judgment [was] appropriate" on its claims against Smith for breach of the Employment Agreement, breach of the Shareholders Agreement, and related declaratory relief. CMP further asserted that under the Employment Agreement it was entitled to liquidated damages of $448,354

---

5. Smith's list included over 500 names, roughly 350 of whom CMP identified as having been its clients during the year preceding Smith's termination.

"(which is $298,903 multiplied by 150%)" as a matter of law. CMP averred that the liquidated damages it was due under the Employment Agreement's noncompete provision were greater than the actual damages it was due under the noncompete provision in the Shareholders Agreement.

¶26    In support of his cross-motion and in opposition to CMP's, Smith submitted declarations from himself, including one wherein he averred that the amount CMP paid him for salary after July 2005 "was never equal to or greater than" the compensation set forth in the Employment Agreement and, specifically, that in 2013 he received a salary of $48,000, rather than the $62,400 he was guaranteed under the Employment Agreement. Smith further averred, in the same declaration, that CMP did not pay distributions to shareholders on a pro rata basis in 2013. In support of these averments, Smith attached a document he described as "a spreadsheet presented by [the] . . . president of CMP . . . to the shareholders of CMP in connection with a meeting of shareholders in February of 2014" (the Spreadsheet). The Spreadsheet indicated that in 2013, the shareholders each received equal "CMPC LLC INCOME" and "CMP INC DIVIDENDS," totaling $152,800, and equal payments for "SALARY-SHAREHOLDER" of $48,000 and for "SALARY-WIFE" of $9,600. The Spreadsheet also indicated, however, that in 2013 one shareholder received $24,001 more for "HEALTH INSURANCE AND CONTRACT" than the other shareholders.

¶27    Smith argued that he should not be barred under rule 26 from relying on his declarations and the Spreadsheet because the fact that he "would be called as a witness [could not have] surprise[d] CMP" and because "[a]ny of the documents put forward by [Smith were] either duplicative of CMP's exhibits . . . or documents that [were] in CMP's possession and control." Smith then asserted that the "Employment Agreement was no longer enforceable due to abandonment or supersession"; that even if the Employment Agreement survived, CMP breached it

first by "not paying [Smith] the compensation owed him under the Employment Agreement"; that under the Shareholders Agreement and Utah law, shareholder "distributions" include shareholder "salaries" and CMP breached the Shareholders Agreement first because, when shareholder "salaries" are included as part of "distributions," CMP did not pay Smith distributions in 2013 in proportion to the shares he owned; and that Utah's Professional Corporation Act prohibited CMP's purchase of his shares.

¶28 Essentially contemporaneously with his cross-motion for summary judgment, Smith separately moved to dismiss CMP's claim for a declaratory judgment that CMP was "entitled to exercise its option to purchase Smith's shares in CMP." Smith stated that "[t]he point of CMP's first claim [was] to have the [c]ourt declare CMP the owner of [Smith's] shares," and he again argued that such a purchase was prohibited by Utah's Professional Corporation Act. The district court denied Smith's motion to dismiss.

¶29 On August 26, 2021, the district court also denied Smith's summary judgment motion and granted CMP's. In doing so, it stated that "[r]ule 26 applies to" Smith and that Smith's "failure to properly disclose evidence during fact discovery bar[red] him from relying upon undisclosed evidence to oppose summary judgment." The court also stated that Smith "was required to raise both [the abandonment and supersession] affirmative defenses in his response to CMP's Complaint in this matter, but he did not." Thus, the court concluded that Smith had waived those affirmative defenses. The court then made the following additional rulings based on the facts that were supported by CMP's evidence alone:

- Smith signed the Employment Agreement, it "is a valid and binding contract," and the parties never terminated it.

- "When [Smith] signed the [Shareholders Agreement], he entered into a second valid and binding contract between himself and CMP" and "remained subject to the terms of the Employment Agreement."

- Smith breached the noncompete provisions of both the Employment Agreement and the Shareholders Agreement.

- Smith "presented no evidence that CMP breached the Employment Agreement, and CMP . . . presented undisputed evidence that it complied with the Employment Agreement's obligations (including the payment of salary)."

- Smith "presented no evidence that CMP breached the [Shareholders] Agreement, and CMP . . . presented undisputed evidence that it complied with the [Shareholders] Agreement's obligations (including the payment of distributions)."

- "Based on CMP's assertion at oral argument, the monetary damages caused by [Smith's] violation of the Shareholder[s] Agreement's covenant not to compete do not exceed the amount that CMP calculated based on the methodology within . . . the Employment Agreement."

- CMP "presented sufficient evidence to calculate the damages as contemplated in . . . the Employment Agreement," and those damages "total[ed] $448,354."

- "CMP followed the Shareholder[s] Agreement's provisions for determining that [Smith] had engaged in discreditable acts, for exercising its option to purchase [Smith's] shares, . . . and for determining that [Smith], after he continued to perform accounting or tax services for CMP clients, was paid in full for his purchased shares."

The court awarded CMP $448,354 in damages and declared that CMP had "properly repurchased [Smith's] shares" under the Shareholders Agreement.

¶30    Smith filed a motion to amend the court's summary judgment ruling or grant a new trial. In that motion, he argued again (among other things) that the court should not have ruled that CMP properly repurchased Smith's shares because (1) "that is not the relief CMP requested in this case"; (2) that relief is not proper under Utah law; and (3) Article 7.03 of the Shareholders Agreement "provide[d] the procedure for how CMP [would] repurchase the shares, including detailed instructions for how to calculate the share price," and "CMP ha[d] not yet followed those required steps." The court denied Smith's motion, responding as follows to Smith's foregoing arguments:

> The [c]ourt finds that the relief it granted to [CMP] regarding the [buyback] provisions was appropriate: [Smith] committed discreditable acts pursuant to Article 7.03 of the Shareholder[s] Agreement, which triggered CMP's right to purchase. The purchase was deemed complete due to [Smith's] ongoing refusal to comply with the covenant not to compete.

¶31    CMP filed a motion for voluntary dismissal of its fourth, fifth, and sixth causes of action against Smith. The court granted that motion and declared that "[a]ll claims originally asserted in [this matter had been] fully and finally litigated." Smith then appealed.

ISSUES AND STANDARDS OF REVIEW

¶32    On appeal, Smith first contends that the "district court lacked discretion to strike [his] third-party complaint as a discovery sanction" under rule 37 of the Utah Rules of Civil

Procedure "because the discovery dispute—and all related motions and orders—concerned only CMP, not the [Other Shareholders]." "As a general rule, district courts are granted a great deal of deference in selecting discovery sanctions, and [an appellate court will] overturn a sanction only in cases evidencing a clear abuse of discretion." *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957. "An abuse of discretion may be demonstrated by showing that the district court relied on an erroneous conclusion of law . . . ." *Id.* (cleaned up).

¶33 Smith next asserts that the district court abused its discretion when—in connection with its summary judgment ruling—it excluded his declarations and the Spreadsheet as a sanction under rule 26 of the Utah Rules of Civil Procedure. Specifically, he asserts that "rule 26 does not require a party to disclose himself as a witness" and that, "even if it did, [his] failure to disclose himself was harmless." He further contends that when he filed his summary judgment motion, the Spreadsheet "was already in the record" and should have therefore still been considered. "Interpretations of the Utah Rules of Civil Procedure are questions of law reviewed for correctness." *RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 18, 392 P.3d 956 (cleaned up). On the other hand, when reviewing a district court's determination under rule 26 as to whether a party's failure to make initial disclosures was harmless, we apply an abuse of discretion standard. *See Cougar Canyon Loan LLC v. Walker*, 2020 UT App 176, ¶¶ 14, 33, 482 P.3d 227.

¶34 Smith raises the following four issues regarding the district court's summary judgment ruling itself:

- First, he contends that if his declarations are considered, they "create[] a dispute concerning whether the Shareholders[] Agreement superseded the Employment Agreement" and, thus, preclude judgment as a matter of law that he breached the Employment Agreement.

- Second, he argues that if his declarations and the Spreadsheet are considered, they create a factual dispute as to whether CMP breached the Employment Agreement first by failing to pay Smith the salary to which he was entitled, thereby precluding judgment as a matter of law on CMP's claims for breach of the Employment Agreement and any related declaratory relief.

- Third, Smith asserts that under the Shareholders Agreement, shareholder "distributions" include shareholder "salaries" and, therefore, that his declarations and the Spreadsheet create a material factual dispute as to whether CMP breached the Shareholders Agreement first by failing to pay Smith distributions on a pro rata basis in 2013, thereby precluding judgment as a matter of law on CMP's claims for breach of the Shareholders Agreement and any related declaratory relief.

- Finally, Smith contends that "the district court erred when it ruled, on summary judgment, that 'CMP properly repurchased [Smith's] shares'" under the Shareholders Agreement because (1) "CMP never asked the court for a declaratory judgment that it had purchased [Smith's] shares," (2) "[u]nder Utah law, a shareholder within a professional corporation *cannot* voluntarily sell his [or her] shares back to the corporation," and (3) "it is *not* undisputed that [Smith] . . . worked for any clients on the 'client list' contemplated in the contract."

"Appellate courts review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 14, 423 P.3d 1150 (cleaned up), who in this context is Smith.

ANALYSIS

I. Dismissal of the Third-Party Complaint as a Rule 37 Sanction

¶35     Smith first contends that the district court exceeded its discretion by dismissing his third-party complaint against the Other Shareholders as a discovery sanction under rule 37 of the Utah Rules of Civil Procedure. The Other Shareholders have not filed a brief or otherwise participated in this appeal; thus, they have presented no argument in opposition to Smith's on this point. "When an appellee fails to present us with any argument, an appellant need only establish a prima facie showing of a plausible basis for reversal." *AL-IN Partners, LLC v. LifeVantage Corp.*, 2021 UT 42, ¶ 19, 496 P.3d 76 (cleaned up). "This is a lower standard than the typical burden of persuasion on appeal." *Id.* We conclude that Smith has met this lower burden here.

¶36     Rule 37 allows a district court to impose sanctions in response to a party's violation of a discovery order. It states that "[u]nless the court finds that the failure was substantially justified, the court, upon motion, may impose appropriate sanctions for the failure to follow" an order regarding disclosure or discovery. Utah R. Civ. P. 37(b). The rule also provides a list of possible sanctions, including deeming "designated facts to be established in accordance with the claim or defense of the party obtaining the order," "prohibit[ing] the disobedient party . . . from introducing designated matters into evidence," and "dismiss[ing] all or part of the action." *Id.* R. 37(b)(1), (2), (4).

¶37     Generally, "district courts have broad discretion in selecting and imposing sanctions" under rule 37. *Ford v. Ford*, 2016 UT App 127, ¶ 10, 379 P.3d 14 (cleaned up). However, there are three prerequisites to a court's exercise of that discretion: (1) there must be an existing discovery or disclosure order, (2) the sanction must be "for the failure to follow" the existing order, and (3) the sanction must be imposed "upon motion." Utah R. Civ. P. 37(b). Smith asserts that the district court lacked discretion to dismiss

his claims against the Other Shareholders as a discovery sanction because that dismissal was not imposed "upon motion." This argument establishes a prima facie showing of a plausible basis for reversal.

¶38   CMP was the only party in this matter to serve written discovery requests. CMP alone moved for an order requiring Smith to fully respond to those requests. When Smith failed to comply with the resulting discovery order, only CMP moved for sanctions against Smith. The specific sanctions CMP asked the district court to "consider" were "striking Smith's pleadings from the record and entering default in favor of CMP." When the court granted CMP's motion, the resulting sanctions order did not include dismissal of Smith's claims against the Other Shareholders, and after that order was vacated on appeal, CMP asked the court on remand to simply "reinstate all of the sanctions that it [had] previously entered."

¶39   In other words, when the court sanctioned Smith by dismissing his claims against the Other Shareholders, there had been no motion by the Other Shareholders seeking dismissal of Smith's claims against them or any other sanction in their favor. Additionally, when CMP's motion for sanctions was readdressed on remand, it did not include a request for sanctions in favor of the Other Shareholders. Therefore, it is at least plausibly correct to say that the dismissal of Smith's claims against the Other Shareholders was not a sanction imposed "upon motion" and, thus, that the dismissal ran afoul of the requirements of rule 37(b).

¶40   Indeed, Smith cites an opinion of the Commonwealth Court of Pennsylvania that endorses the argument he relies on here. In *Smith v. Philadelphia Gas Works*, 740 A.2d 1200 (Pa. Commw. Ct. 1999), a personal injury plaintiff sued six

defendants.[6] *Id.* at 1201. One of the defendants (the requesting defendant) served a discovery request on the plaintiff, to which the plaintiff did not respond. *Id.* at 1202. Thus, the requesting defendant filed a motion to compel, which the trial court granted, ordering the plaintiff to respond within twenty days. *Id.* After twenty days passed without a response, the requesting defendant filed a motion for sanctions. *Id.* The trial court granted that motion and ordered the plaintiff to respond to the discovery request within forty-five days, "indicating that, if [the plaintiff] failed to comply, she [might] be prohibited from introducing any type of evidence." *Id.* (cleaned up). The plaintiff again failed to respond, and the requesting defendant filed another motion for sanctions. *Id.* The trial court granted this motion by issuing an order prohibiting the plaintiff "from introducing any type of evidence" at trial. *Id.* (cleaned up). When the case came to trial, the trial court enforced its sanctions order, barred the plaintiff from presenting evidence, and—although "nothing in the record indicate[d] that any of the five other defendants formally adopted or joined [the requesting defendant's] motions"—dismissed the plaintiff's case against all six of the defendants. *Id.*

¶41 The plaintiff appealed. *Id.* On appeal, she "concede[d] that the trial court correctly dismissed her case against" the requesting defendant. *Id.* But she argued "that the trial court erred by dismissing her case against the five other [d]efendants who were not parties to [the requesting defendant's] motion to compel or its motions for sanctions." *Id.* The Commonwealth Court of Pennsylvania agreed. *Id.* Like Utah's rule 37(b), rule 4019(a)(1) of the Pennsylvania Rules of Civil Procedure provided that a court could, "*on motion*, make an appropriate order if . . . a party or person . . . fail[ed] to make discovery or to obey an order of court

---

6. The *Smith* plaintiff initially sued seven defendants, but the claims against one of the defendants were dismissed before the relevant events in the case transpired. *See Smith v. Philadelphia Gas Works*, 740 A.2d 1200, 1201 (Pa. Commw. Ct. 1999).

respecting discovery." Pa. R. Civ. P. 4019(a)(1) (emphasis added).[7] Against the backdrop of that rule, the Pennsylvania court explained, "Nothing in [rule] 4019 intimates that a court may impose sanctions in favor of non-moving parties. Rather, a motion must be presented to the court." *Smith*, 740 A.2d at 1203 (cleaned up). It then elaborated,

> [Rule] 4019(a)(1) directs the court to exercise its discretion in fashioning an appropriate order upon consideration of the motion for sanctions before it, and the trial court's authority does not extend to concerns or matters extraneous to the motion before it. In other words, a trial court may not sua sponte impose a sanction order for violations of pretrial discovery orders; rather, the sanction order must be imposed pursuant to a motion of a party. Here, the effect of the trial court's dismissal of [the plaintiff's] case against all [the] defendants was to sua sponte impose a discovery sanction in favor of parties who did not file motions for the sanction. Thus, here, . . . the trial court lacked authority to consider the effect of [the plaintiff's] noncompliance with its discovery order upon defendants who neither filed motions themselves nor formally adopted or joined in the motions filed.

*Id.* (cleaned up). This reasoning is sound and confirms that Smith has established a prima facie showing of a plausible basis for

---

7. The Pennsylvania rule has been amended since *Smith*, but those amendments did not change the relevant language that we quote here. *See* Pa. R. Civ. P. 4019; 29 Pa. Bull. 2281 (Apr. 12, 1999); 33 Pa. Bull. 5506 (Oct. 24, 2003). We therefore cite the current version of the rule for convenience.

reversal of the district court's dismissal of his claims against the Other Shareholders.

¶42 Although the Other Shareholders have presented no arguments on this point, CMP has. However, even assuming that CMP has standing to make such arguments, CMP's arguments do not persuade us that Smith has failed to meet his lowered burden of persuasion in this appeal.

¶43 CMP first notes that in this case "Smith refused to provide even rudimentary initial disclosures," while in the Pennsylvania case cited above, there was no indication that the plaintiff had similarly failed to provide any initial disclosures. CMP then argues that "[t]here is a significant difference in a party refusing to provide initial disclosures (which are required without a discovery request) and a party's refusal to provide responses to discovery requests from one party." However, a party's failure to provide initial disclosures triggers "automatic and mandatory" sanctions under rule 26(d) of the Utah Rules of Civil Procedure that "do not require a predicate discovery order," while rule 37(b) sets up a separate regime of "more expansive sanctions" that are "not self-executing" for a party's failure to comply with a discovery order. *Bailey v. Bailey*, 2024 UT App 51, ¶¶ 25, 27, 548 P.3d 519 (cleaned up). Thus, while the factual distinction between this case and the above-referenced Pennsylvania case might prompt different outcomes under rule 26(d), it does not form the basis for a different outcome under rule 37(b).

¶44 CMP's second assertion is that "[t]o the extent that any foreign authority might apply to this situation, *Payne v. Exxon Corp.*, 121 F.3d 503 (9th Cir. 1997), provides a much more appropriate analysis." CMP contends—apparently correctly so—that "*Payne* stands for the proposition that a federal district court acts within the scope of the authority granted it by [r]ule 37(b)(2) of the Federal Rules[] when it dismisses a plaintiff's claims against all defendants[] based on the plaintiff's failure to obey a court

order compelling discovery requested by only one defendant." (Citing *Payne*, 121 F.3d at 509–10.) However, we find *Payne* unpersuasive both because federal rule 37(b)(2) is materially different from Utah's rule 37(b) and because the facts of *Payne* are materially different from the facts here.

¶45 In *Payne*, a set of plaintiffs sued two defendants. *See id.* at 505. The first defendant sent discovery requests to the plaintiffs. *See id.* After the plaintiffs failed to respond, the first defendant filed a motion to compel, which was granted. *See id.* The second defendant "filed a similar motion, which the district court [also] granted." *Id.* The first defendant subsequently filed two more motions to compel, which were each granted. *See id.* Later, "dissatisfied with the responses it received from the plaintiffs, [the first defendant] filed a motion to dismiss." *Id.* (cleaned up). In response, the district court issued an order giving the plaintiffs "one *last* chance to comply with the court's previous orders" and warning that if the plaintiffs failed to comply this time, the "action [would] be dismissed in its entirety without further notice." *Id.* at 506. The plaintiffs thereafter "paid the outstanding sanctions orders, provided some additional discovery responses, and filed a Notice of Compliance." *Id.* Upon reviewing the plaintiffs' additional discovery responses, the first defendant "filed an objection to the Notice of Compliance," and the second defendant "joined in the objection," asking the district court "to dismiss [the] claims against it pursuant to the court's [latest] order." *Id.* The district court "treated these objections as a renewed motion to dismiss" and granted the motion as to both defendants. *Id.* The plaintiffs appealed. *See id.* at 507.

¶46 On appeal, the plaintiffs argued that dismissal of their claim against the second defendant as a sanction "for discovery noncompliance was inappropriate because there were no outstanding discovery requests from" the second defendant. *Id.* at 509. The Ninth Circuit disagreed. *See id.* at 509–10. It noted that under rule 37(a)(2)(B) of the Federal Rules of Civil Procedure,

"only the discovering party[] . . . may bring a motion to compel a response to specific interrogatories, requests for production, and the like" but that "the sanctions provisions of [federal] rule 37(b)(2) contain no such standing limitation." *Id.* at 510 (cleaned up). The Ninth Circuit demonstrated the lack of such a limitation on sanctions in federal rule 37(b)(2) by quoting the version of that rule then in effect, in relevant part, as follows:

> If a party . . . fails to obey an order to provide or permit discovery . . . [,] the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> . . .
>
> (C) An order . . . dismissing the action or proceeding or any part thereof . . . .

*Id.* (quoting Fed. R. Civ. P. 37(b)(2) (1997)). It then elaborated, "If Congress had intended to limit the district court's dismissal authority to claims against the party who propounded discovery, it would not have chosen such sweeping language." *Id.* The Ninth Circuit also concluded "that the district court did not abuse its discretion by dismissing the claim against" the second defendant because the second defendant "brought its own successful motion to compel discovery early in the discovery process, cooperated in [the first defendant's] later efforts to secure adequate responses, and joined in [the first defendant's] final motion to dismiss." *Id.*

¶47 Significantly, federal rule 37(b)(2)—both as quoted in *Payne* and as written now—is materially different from Utah's rule 37(b), which controls here. Specifically, the federal rule contains no requirement that sanctions for failure to comply with a discovery order be imposed "upon motion." *See* Fed. R. Civ. P. 37(b)(2); *Payne*, 121 F.3d at 510. Additionally, unlike the second defendant in *Payne*, the Other Shareholders in this case did not file their own motion to compel, did not participate in CMP's efforts

to secure adequate discovery responses, and did not join in CMP's motions for sanctions. Thus, we do not agree with CMP that *Payne* provides a more appropriate analysis for purposes of this case or that it otherwise renders Smith's argument on this issue less than plausible.[8]

---

8. As noted above, the district court stated its view that "Smith did not separate, or otherwise differentiate between," his counterclaims and his third-party complaint and, thus, that the striking of Smith's counterclaims necessarily "include[d] the striking of his third party complaint." *See supra* ¶ 22. On appeal, Smith maintains that his counterclaims were "distinct from his third-party complaint" and that the district court "erred in ruling that striking [Smith's] counterclaim necessarily entailed striking his third-party complaint." CMP concedes that Smith's "third-party claims are distinct from his counterclaims," but it contends that his third-party claims are nevertheless improper because Smith has not alleged that the Other Shareholders "[are] or may be liable to him for all or part of [CMP's] claim[s] against him." Utah R. Civ. P. 14(a); *see also Windsor Mobile Estates, LLC v. Sweazey*, 2019 UT App 44, ¶ 7, 440 P.3d 864 ("A third-party claim may be asserted under rule 14(a) only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to the defending party." (cleaned up)). Because the Other Shareholders did not seek dismissal of Smith's third-party claims on this basis in the district court, we decline to address this argument here. *See generally Richmond v. Bateman*, 2024 UT App 103, ¶ 31, 554 P.3d 341 ("We are mindful that we are a court of review, not of first view." (cleaned up)).

¶48 For the foregoing reasons, we reverse the district court's dismissal of Smith's third-party complaint against the Other Shareholders.[9]

## II. Exclusion of Smith's Evidence Under Rule 26

¶49 Smith next argues that the district court abused its discretion when it excluded his declarations and the Spreadsheet because he failed to provide initial disclosures during the discovery period. In Smith's view, rule 26 of the Utah Rules of Civil Procedure "does not require a party to disclose himself as a potential witness" and, even if it does, his "failure to disclose himself [in this case] was harmless." And he contends that the Spreadsheet should not have been excluded because it "was already in the record" when the court ruled on the cross-motions for summary judgment.

¶50 Rule 26 requires that as part of a party's initial disclosures, the party must provide, among other things, "the name and, if known, the address and telephone number of . . . each fact witness the party may call in its case-in-chief and . . . a summary of the [witness's] expected testimony." Utah R. Civ. P. 26(a). In the event "a party fails to disclose or to supplement timely a disclosure . . . , that party may not use the undisclosed witness . . . at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." *Id.* R. 26(d)(4). Here, we disagree with Smith's assertion that a party never needs to disclose himself or herself as a witness who may be called in the party's case-in-chief. But we conclude that under the circumstances of this case, the

---

9. Because we decide the rule 37 sanctions issue based on "the lowered appellate burden of making a prima facie showing of a plausible basis for reversal," our decision on this issue "is a non-merits decision that is not intended to have any precedential value." *State v. Coleman*, 2025 UT App 33, ¶ 20, 566 P.3d 772 (cleaned up).

district court exceeded its discretion by not determining that Smith's failure to disclose himself as a potential witness was harmless.

A.      No Per Se Rule that a Party's Failure to Disclose Himself or Herself as a Potential Witness Is Always Harmless

¶51     "Rule 26(d)(4) expressly provides that a district court need not exclude evidence or witnesses when disclosures have not been made if that failure is 'harmless' or 'good cause' is shown." *Hansen v. Kurry Jensen Props. LLC*, 2021 UT App 54, ¶ 43, 493 P.3d 1131 (Mortensen, J., concurring). We have previously declined, however, to adopt a per se rule that failure of one party to disclose the opposing party as a potential witness is always harmless. *See Johansen v. Johansen*, 2021 UT App 130, ¶¶ 2, 15, 19, 504 P.3d 152. We now decline to adopt a per se rule that failure of a party to disclose himself or herself as a potential witness is always harmless.

¶52     In *Johansen*, a divorce action, after the husband failed to disclose the wife as a potential witness in his initial disclosures, the husband urged adoption of a rule that "it is always harmless to omit from initial disclosures the fact that the plaintiff plans to call the opposing party as a witness because that party will always know their own testimony." *Id.* ¶ 19. We declined. *See id.* We explained that such an "approach [would] essentially eviscerate[] the rule that explicitly requires parties to designate the opposing party as a witness if they intend to call the opposing party in their case-in-chief at trial, albeit with a less extensive disclosure duty than with other witnesses." *Id.* (explaining that Utah Rule of Civil Procedure 26(a)(1)(A)(ii) requires parties to designate "each fact witness the party may call in its case-in-chief and, except for an adverse party, a summary of the expected testimony"). We further explained that while "a party may well know the content of their own testimony, . . . the fact that they will or will not be called as a witness by the other side in the other side's case-in-

chief undoubtedly will dictate how they prepare to prosecute or defend at trial." *Id.* (cleaned up). Thus, we reasoned, "an opposing party can be harmed" when the other party fails to disclose the opposing party as a potential witness in the other party's case-in-chief. *Id.* We therefore concluded that "the district court exceeded its discretion in determining that [the husband's] failure to provide initial disclosures naming [the wife] as his only case-in-chief witness was harmless." *Id.*

¶53 Relatedly, in *Segota v. Young 180 Co.*, 2020 UT App 105, 470 P.3d 479, we implicitly rejected a per se rule that it is always harmless for an initially non-disclosing party—in that case the plaintiff—to belatedly provide initial disclosures that are "identical to [the opposing party's] own disclosures." *Id.* ¶ 21 (cleaned up). We stated that "although the defendants might have—before receiving [the plaintiff's] disclosures—made some assumptions, or even had suspicions, about the identity of the witnesses and evidence [the plaintiff] might use in an attempt to prove her claims, they did not actually know the scope of [the plaintiff's] case until finally receiving her belated disclosures." *Id.* (cleaned up). We then held that "one party's ability to guess at what the other party's disclosures might be, had they been timely made, does not relieve the other party from its obligation to definitively inform her litigation opponent, through disclosures, about the witnesses and documents she plans to use to prove her case." *Id.* (cleaned up). Ultimately, we declined to hold that the district court had abused its discretion "by concluding that the defendants—who, at the conclusion of the fact discovery period, knew nothing specific about the scope of [the plaintiff's] case— had been harmed by [the plaintiff's] failure to disclose." *Id.*

¶54 Rule 26 requires a party to disclose "each fact witness the party may call in its case-in-chief." Utah R. Civ. P. 26(a)(1)(A)(ii). While rule 26 does not separately identify the disclosing party himself or herself as a witness who must be disclosed, the term "each fact witness" plainly includes the disclosing party when the

party is a natural person. Additionally, by explicitly relaxing the disclosure requirement when a party discloses "an adverse party" as a potential witness, the drafters of rule 26 strongly suggested that if they had intended any other exception to the witness disclosure requirement, they would have made that exception explicit as well. Moreover, just as one party's knowledge "that [he or she] will or will not be called as a witness by the other side in the other side's case-in-chief undoubtedly will dictate how [that party] prepare[s] to prosecute or defend at trial," a party's knowledge as to whether the opposing party plans to testify in his or her own case-in-chief undoubtedly will dictate how the party prepares for trial. *Johansen*, 2021 UT App 130, ¶ 19. Finally, our holding in *Segota* that "one party's ability to guess at what the other party's disclosures might be, had they been timely made, does not relieve the other party from its obligation to definitively inform her litigation opponent, through disclosures, about the witnesses and documents she plans to use to prove her case," 2020 UT App 105, ¶ 21 (cleaned up), essentially demands that we reject a per se rule that failure of a party to disclose himself or herself as a potential witness in his or her own case-in-chief is always harmless. For all of these reasons, we do not adopt such a rule.

B.     Smith's Failure to Disclose Himself as a Potential Witness in this Case Was Harmless

¶55     While we decline to adopt a per se rule that it is always harmless for a party to fail to disclose himself or herself as a potential witness in the party's case-in-chief, we conclude that the district court exceeded its discretion by not determining that Smith's failure to disclose himself as a potential witness was harmless under the particular circumstances of this case. The case of *Sabour v. Koller*, 2024 UT App 26, 546 P.3d 28, provides a useful starting point for our analysis in this regard.

¶56     In *Sabour*, the plaintiffs disclosed that they might call themselves as witnesses in their case-in-chief, but they failed to

provide adequate summaries of their expected testimony as required by rule 26(a). *See id.* ¶¶ 28–33. Thus, the defendant moved to exclude the plaintiffs from "providing any opinions at trial that they could and should have disclosed." *Id.* ¶ 17 (cleaned up). The district court denied that motion. *See id.* After losing at trial, the defendant appealed the district court's determination that the plaintiffs' "witness disclosures were sufficient" and its ruling "allowing the [plaintiffs] to testify in their case-in-chief." *Id.* ¶ 25.

¶57 On appeal, we held that the plaintiffs did not adequately disclose the substance of their anticipated testimony, but we determined that the district court did not abuse its discretion by deeming that failure to be harmless because—notwithstanding the deficient disclosure—the defendant had deposed the plaintiffs. *See id.* ¶¶ 34–40. We explained that "the deficiencies of the expected testimony summaries were remedied by the fact that [the defendant] deposed each witness and thus was able to gain sufficient knowledge of their testimony to proceed with his defense at trial and address their evidence." *Id.* ¶ 35 (cleaned up). We concluded that the defendant had failed to carry "his burden of demonstrating harm largely because he [had] not addressed how, despite having deposed each of the [plaintiffs], their trial testimony took him by surprise." *Id.* ¶ 38.

¶58 Based on reasoning similar to what we employed in *Sabour*, we conclude that the district court here exceeded its discretion by not deeming Smith's failure to disclose himself as a potential witness and his failure to disclose the Spreadsheet harmless. With several months remaining in fact discovery, Smith testified at a hearing on CMP's motion for a preliminary injunction and submitted a declaration in opposition to that motion. Thereafter, he submitted two more declarations, all before the court issued its first discovery sanctions. Given these actions and the fact that Smith is the only party to the Employment Agreement and the Shareholders Agreement who is able to provide his version of

events, the fact that Smith planned to call himself as a witness in his case-in-chief could not have taken the Other Shareholders by surprise. Moreover, given the detailed allegations in Smith's counterclaim and third-party complaint, along with the facts to which he testified in the preliminary injunction hearing and which he averred in his declarations, we cannot say that CMP and the Other Shareholders were prejudiced by Smith's failure to separately provide "a summary of [his] expected testimony" by way of initial disclosures. Utah R. Civ. P. 26(a)(1)(A)(ii); *cf. Al-Imari v. Utah Dep't of Transp.*, 2026 UT App 15, ¶ 22 (stating that "a 'summary' of a witness's 'expected testimony should be just that—a summary'" and that "'[t]he rule does not require prefiled testimony or detailed descriptions of everything a witness might say at trial'" (alteration in original) (quoting Utah R. Civ. P. 26 advisory committee's note to 2011 amendment)), *petition for cert. filed*, Mar. 5, 2026 (No. 20260261). Finally, Smith included the Spreadsheet as an attachment to a declaration he submitted three years before the summary judgment motions at issue here, and CMP has made no argument that Smith's failure to disclose the Spreadsheet earlier—as part of initial disclosures during the discovery period—has prejudiced its ability to respond to the document. Accordingly, we conclude that the district court exceeded its discretion by not determining that Smith's failure to include that document in an initial disclosure was also harmless.

¶59 Given the foregoing, on remand, Smith should not be prohibited under rule 26 from serving as a fact witness in this matter or from introducing the Spreadsheet into evidence. Additionally, we will consider Smith's declarations and the Spreadsheet as we address Smith's challenges to the district court's summary judgment rulings.

### III. The Grant of Summary Judgment in Favor of CMP

¶60 We now turn to the court's grant of summary judgment in favor of CMP on CMP's causes of action against Smith for breach

of the Employment Agreement, breach of the Shareholders Agreement, and related declaratory relief. Smith offers four arguments for why we should reverse at least some of the court's summary judgment rulings. We address each of them in turn.

## A. Smith's Argument that the Employment Agreement Was Superseded

¶61 First, Smith argues that if his declarations and testimony from the preliminary injunction hearing are considered, they "create[] a dispute concerning whether the [Shareholders] Agreement superseded the Employment Agreement" and, thus, preclude judgment as a matter of law that he breached the Employment Agreement. In its summary judgment ruling, the district court rejected Smith's supersession theory for two alternative reasons. First, it noted that "Smith failed to timely or properly raise . . . [his] abandonment and supersession affirmative defenses . . . in his response to CMP's Complaint in this matter," and it held that he had thus "waived the right to argue . . . supersession." Second, the court determined that "even if [Smith] had not waived these affirmative defenses, both arguments fail[ed] on their merits." On appeal, Smith again argues the merits of his supersession theory, but he fails to address the alternative basis the district court gave for rejecting this theory—namely, that Smith had waived it by not raising it as an affirmative defense in his answer. Because an appellate court "will not reverse a ruling of the district court that rests on independent alternative grounds where the appellant challenges only one of those grounds," *Gilbert v. Utah State Bar*, 2016 UT 32, ¶ 24, 379 P.3d 1247, we do not disturb the district court's determination that Smith waived the right to argue that the Employment Agreement was superseded and, thus, that he cannot be deemed to have breached it.

B.      Smith's Argument that CMP Breached the Employment
        Agreement First, Thereby Precluding Summary Judgment
        on CMP's Claim for Breach of the Employment Agreement

¶62    Smith contends that when his declarations and the
Spreadsheet are considered, they create a factual dispute as to
whether CMP breached the Employment Agreement first by
failing to pay Smith the salary to which he was entitled, thereby
precluding judgment as a matter of law on CMP's claims for
breach of the Employment Agreement and related declaratory
relief. *See generally Cross v. Olsen*, 2013 UT App 135, ¶ 25, 303 P.3d
1030 ("Under the first breach rule[,] a party first guilty of a
substantial or material breach of a contract cannot complain if the
other party thereafter refuses to perform." (cleaned up)). We
agree with Smith on this point.

¶63    As part of its summary judgment papers, CMP cited
evidence in the record suggesting that after Smith signed the
Employment Agreement and until his termination, "CMP paid a
salary to Smith every month" and the salary was "more than the
Employment Agreement required." In contrast, Smith averred in
one of the declarations he submitted as part of his summary
judgment papers that the amount CMP paid him for salary after
July 2005 "was never equal to or greater than" the compensation
set forth in the Employment Agreement and, specifically, that in
2013 he received a salary of $48,000 rather than the $62,400 he was
guaranteed under the Employment Agreement. Because any
failure by CMP to pay Smith the salary to which he was entitled
under the Employment Agreement would have occurred prior to
Smith's post-termination breach of the Employment Agreement's
noncompete provision, on which the award of liquidated
damages was based, the competing evidence regarding the salary
Smith was actually paid creates a genuine issue of material fact as
to whether CMP was the first to breach the Employment
Agreement. Accordingly, we reverse the district court's summary
judgment ruling in favor of CMP on CMP's claim for breach of the

Employment Agreement and any related declaratory relief at odds with our analysis here.

¶64 On remand, the following issues should be addressed in order: (1) the factual question of whether CMP was the first to breach the Employment Agreement and (2) if so, the related legal question of whether the first breach rule applies to preclude CMP's claims against Smith for breach of the Employment Agreement and related declaratory relief. *See generally Larson v. Stauffer*, 2022 UT App 108, ¶ 26, 518 P.3d 175 ("The first breach rule provides that when one party materially breaches a provision of a contract, the other party's subsequent failure to perform a specific obligation is excused if the promises are mutually dependent." (cleaned up)); *Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 374–78 (Utah 1996) (addressing as a matter of law whether under "the contract doctrine of mutually dependent covenants," a tenant's "obligation to pay rent" was dependent on the landlord's "covenant to repair" the premises).

¶65 If the court determines (1) that CMP was the first to breach the Employment Agreement and (2) that the first breach rule applies, then CMP will be precluded from receiving liquidated damages for Smith's post-termination breach of the Employment Agreement's noncompete clause. On the other hand, if the court determines that the first breach rule does not apply, then CMP may still be entitled to an award of liquidated damages under the terms of the Employment Agreement. Any application of the first breach rule to CMP's claims for breach of the Employment Agreement will not preclude CMP's recovery of damages for Smith's breach of the Shareholders Agreement's noncompete provision or a declaratory judgment as to CMP's reacquisition of Smith's shares under the terms of the Shareholders Agreement.

C.      Smith's Argument that CMP Breached the Shareholders
        Agreement First, Thereby Precluding Summary Judgment
        on CMP's Claim for Breach of that Agreement and Related
        Declaratory Relief

¶66    In one of the declarations Smith submitted with his
summary judgment papers, he asserted that shareholder
"[d]istributions were not paid on a pro rata basis for 2013 . . . , as
illustrated in [the Spreadsheet]." Viewed in a light most favorable
to Smith, the Spreadsheet indicates that in 2013, one shareholder
was paid more for "HEALTH INSURANCE AND CONTRACT"
than were the other shareholders despite the fact that the
shareholders each owned an equal number of shares. Smith
contends that this evidence raises a material dispute of fact as to
whether CMP was the first to breach the Shareholders Agreement,
thereby excusing Smith's subsequent breach of that agreement.
As the parties acknowledge, the validity of Smith's argument
turns on whether under the Shareholders Agreement a
shareholder's "distributions" include the shareholder's
"salary."[10] Smith contends that the district court erred by
implicitly ruling that "distributions" do not include "salary." We
disagree.

¶67    "When interpreting a contract, a court first looks to the
contract's four corners to determine the parties' intentions, which
are controlling. If the language within the four corners of the
contract is unambiguous[,] a court determines the parties'

_____

10. As noted, the extra compensation paid to one of the
shareholders in 2013 was identified on the Spreadsheet as being
for "HEALTH INSURANCE AND CONTRACT." Smith affirmed
in his reply brief, however, that this extra payment indicated that
"in 2013, CMP's shareholders were not paid equal salaries."
Accordingly, we likewise treat the payment in 2013 to one of the
shareholders of an unequal amount for "HEALTH INSURANCE
AND CONTRACT" as the payment of unequal salaries.

intentions from the plain meaning of the contractual language as a matter of law." *Fairbourn Com., Inc. v. American Housing Partners, Inc.*, 2004 UT 54, ¶ 10, 94 P.3d 292 (cleaned up). In evaluating a contract's plain meaning, "a court is to consider each provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* (cleaned up). "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Id.* (cleaned up). Here, the Shareholders Agreement's language plainly indicated that shareholder "salaries" are distinct from shareholder "distributions."

¶68 Article 2.05 of the Shareholders Agreement expressly tied "distributions" to a shareholder's ownership of "capital stock," requiring that "distributions" be paid "pro-rata . . . with respect to each share" owned. In contrast, Article 2.06 expressly tied a shareholder's "salary" to the shareholder's status as "an employee" or to some other "agreed to relationship" and provided that the "salary" to be paid would be "determined by the majority of the [s]hareholders." Interpreting a shareholder's distributions to include the shareholder's salary would render superfluous the provision in Article 2.06 that tied salary to employment or to some other yet-to-be-agreed-upon relationship because a shareholder's salary would always have to conform to ownership status, regardless of any other relationship. Likewise, interpreting distributions to include salaries would make meaningless the provision in Article 2.06 for salaries to be determined by a majority vote of the shareholders because the shareholders would be required to always vote for salaries that accorded exactly pro rata with respect to each share owned. We must therefore conclude that under the plain meaning of the Shareholders Agreement, a shareholder's "distributions" do not include the shareholder's "salary." Accordingly, even when Smith's declarations and the Spreadsheet are considered, the district court did not err by implicitly concluding that the first

breach rule did not apply and preclude summary judgment in favor of CMP on its claims for breach of the Shareholders Agreement and related declaratory relief.

¶69   In his principal brief, Smith resisted this conclusion by pointing to various definitions of the term "distributions" found in the Utah Code. However, because our conclusion is based on the plain meaning of the Shareholders Agreement, we do not look to other sources for a definition of its relevant terms. *See Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 23, 133 P.3d 428 ("Since the clause was unambiguous, there is no need to try to divine its meaning from evidence outside the four corners of the contract."). In his reply brief and at oral argument, Smith resisted this conclusion by arguing that if there was "any ambiguity" as to whether distributions include salaries, "it is conclusively resolved by CMP's course of performance." But we have determined that the Shareholders Agreement is not ambiguous in this regard, and in any event, we generally will not consider an argument raised for the first time in a reply brief. *See, e.g.*, *Lindsay v. Walker*, 2015 UT App 184, ¶ 28, 356 P.3d 195.

D.    Smith's Argument that the District Court Improperly Ruled that CMP Already Repurchased Smith's Shares

¶70   Finally, Smith asserts that the district court erred when it ruled, on summary judgment, that "CMP properly purchased [Smith's] shares." He contends that this is true for three reasons: (1) "CMP never asked the court for a declaratory judgment that it had purchased [Smith's] shares," (2) "[u]nder Utah law, a shareholder within a professional corporation *cannot* voluntarily sell his [or her] shares back to the corporation," and (3) even if a shareholder can voluntarily sell his or her shares back to a professional corporation, "it is *not* undisputed that [Smith] . . . worked for any clients on the 'client list' contemplated in the contract," thereby triggering the buyback provision of the Shareholders Agreement. We are not persuaded by the first and

second of Smith's arguments, but we are by the third. Specifically, we determine that CMP's request for a declaratory judgment that it had purchased Smith's shares was tried by consent and that a shareholder of a professional corporation may voluntarily sell his or her shares back to the corporation but that a material dispute remains as to whether Smith worked for clients on the contemplated client list after CMP exercised its right to purchase his shares. Based on this last conclusion, we ultimately reverse the district court's declaration on summary judgment that CMP already purchased Smith's shares.

1. CMP's Request for a Declaratory Judgment that It Had Purchased Smith's Shares Was Tried by Consent

¶71 Smith argues that the district court erred when it ruled that CMP had properly purchased Smith's shares because "CMP never asked the court for a declaratory judgment that it had purchased [Smith's] shares." He asserts that "a court may grant relief only if (i) the relief was requested in the complaint . . . or (ii) the claim was tried by express or implied consent." He contends that neither of these things happened here. We disagree.

¶72 Rule 15(b)(1) of the Utah Rules of Civil Procedure states that "[w]hen an issue not raised in the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Under this rule, "if the trial court determines that the party had notice of the claim presented and did not object to the introduction of evidence related to the claim, then the trial court has no discretion . . . and must treat the claim as if it were properly raised in the pleadings." *Fisher v. Davidhizar*, 2011 UT App 270, ¶ 9, 263 P.3d 440 (cleaned up). Rule 15(b) does not lose its application when claims are litigated and dismissed before trial. *See id.* ¶ 10. "Although rule 15(b) uses the word 'tried,' the Utah Supreme Court has applied rule 15(b) to a case that was adjudicated at the summary judgment stage of litigation." *Id.* (citing *Ward v. Intermountain Farmers Ass'n*, 907 P.2d

264, 267 n.5 (Utah 1995)). Thus, "rule 15(b) is applicable to a case such as this one where claims were litigated by motions for summary judgment rather than at trial." *Id.*

¶73 By the time of the summary judgment proceedings at issue, Smith was plainly on notice of CMP's request for a declaratory judgment that it had purchased Smith's shares. While the first appeal was pending, Smith moved for a stay of execution and asserted that he owned "a current 20% shareholder interest in CMP." CMP responded by saying, "[L]ong ago CMP repurchased [Smith's shares] from him. He has no shares . . . ." Thereafter, clearly aware of CMP's claim, Smith himself informed the court—in connection with his motion to dismiss CMP's first cause of action, which he filed essentially contemporaneously with his cross-motion for summary judgment—that "[t]he point of CMP's first claim is to have the [c]ourt declare CMP the owner of [Smith's] shares." Having himself informed the court that CMP was seeking a declaratory judgment that it had purchased Smith's shares, Smith cannot credibly claim he lacked notice of such a claim.

¶74 Moreover, Smith did not object to the introduction of evidence related to the assertion that CMP had already purchased his shares. Specifically, in support of its summary judgment motion, CMP recited the language of the Shareholders Agreement providing that if a shareholder whose conduct had been deemed discreditable and as to whom CMP had exercised its right to repurchase his or her shares "perform[ed] accounting or tax services for any client of [CMP] during the five year [buyout] period[,] . . . the balance remaining on the note payable to the selling [s]hareholder [would] be deemed paid in full and [CMP would] then have no further obligation to the selling [s]hareholder." CMP then identified evidence in the record in support of the following facts:

- After Smith's employment was terminated, the Other Shareholders "voted and unanimously determined that [Smith's] actions were discreditable acts under the terms of the Shareholder[s] Agreement."

- At the same time, CMP "exercised its option to purchase [Smith's] shares."

- "On December 12, 2014, CMP notified Smith in writing of the [Other Shareholders'] decision that he had engaged in discreditable acts and also [of] the decision for CMP to acquire his shares pursuant to the terms of the Shareholder[s] Agreement."

- Smith "admitted in documents filed with the [c]ourt and in testimony given during the [p]reliminary [i]njunction evidentiary hearing that he provided accounting related and tax services . . . after CMP terminated him" for people who were CMP clients during the one year prior to Smith's termination.

- Smith's representation of such clients continued through July 31, 2016.

In response, Smith did not object to the introduction of any of the foregoing evidence on the ground that it related to a claim or requested remedy that was not properly before the court.

¶75   In sum, Smith was on notice that CMP was asking for a declaratory judgment that it had purchased Smith's shares, and he did not object to introduction of the evidence supporting that request on the ground that the request was not properly before the court. Accordingly, we conclude that CMP's request for a declaratory judgment that it had already purchased Smith's shares was litigated during the summary judgment proceedings by the consent of the parties.

2.     A Shareholder in a Professional Corporation Can Voluntarily Sell His or Her Shares Back to the Corporation

¶76    Smith also argues that "[u]nder Utah law, a shareholder within a professional corporation *cannot* voluntarily sell his [or her] shares back to the corporation." Again, we disagree.

¶77    The Utah Revised Business Corporation Act (the Business Corporation Act) provides that "[a] corporation may acquire its own shares." Utah Code § 16-10a-631(1). At the same time, Utah's Professional Corporation Act states that a shareholder of a professional corporation "may voluntarily transfer shares of capital stock in a professional corporation only to . . . persons who are duly licensed to render the same specific professional services as those for which the corporation was organized." *Id.* § 16-11-7(1). The Professional Corporation Act provides that the provisions of the Business Corporation Act "shall be applicable to professional corporations, . . . except where inconsistent with [the Professional Corporation Act]." *Id.* § 16-11-5. Thus, the question of whether CMP can lawfully purchase Smith's shares turns on whether the provision in the Business Corporation Act allowing corporations generally to "acquire [their] own shares," *id.* § 16-10a-631(1), is inconsistent with the Professional Corporation Act's provision limiting a shareholder's voluntary transfer of shares in a professional corporation to "only . . . persons who are duly licensed to render the same specific professional services as those for which the corporation was organized," *id.* § 16-11-7(1). We conclude that when these provisions are considered in context and as a whole, they are not inconsistent and, thus, that under the Business Corporation Act's provision allowing a corporation to acquire its own shares, CMP may lawfully acquire Smith's shares.

¶78    When we interpret a statute, we read its plain language "as a whole . . . and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92 (cleaned up). We therefore

examine the whole of sections 16-10a-631(1) and 16-11-7 and the statutes related to them.

¶79   Section 16-10a-631(1) states in full, "A corporation may acquire its own shares and shares so acquired constitute authorized but unissued shares." Utah Code § 16-10a-631(1). Section 16-11-7 reads in full as follows:

> (1) A professional corporation may issue the shares of its capital stock and a shareholder may voluntarily transfer shares of capital stock in a professional corporation only to:
>
>> (a) persons who are duly licensed to render the same specific professional services as those for which the corporation was organized; or
>>
>> (b) persons other than those meeting the requirements of Subsection (1)(a) to the extent and in the proportions allowed by the applicable licensing act for the profession for which the corporation is organized.
>
> (2) Any shares issued in violation of this section are void.

*Id.* § 16-11-7.

¶80   Section 16-11-7 deals with the *issuance* of shares and the *transfer* of those *issued* shares. On the other hand, section 16-10a-631(1) employs different language, speaking in terms of *acquiring* shares that are rendered *unissued* by the acquisition. Plainly the provisions address different concerns. Section 16-11-7 appears to be aimed at "assur[ing] that corporate control will remain with persons licensed in [a particular] profession, and bound by the same professional standards and ethics, by restricting the sale or transfer of stock to members of the profession." *Berrett v. Purser*

*& Edwards*, 876 P.2d 367, 368–69 (Utah 1994) (cleaned up), while section 16-10a-631(1) allows a corporation to absorb issued shares to increase ownership concentration and act as a defense against ownership by someone who may be hostile to the corporation.

¶81   In *Berrett*, our supreme court, in holding that professional corporations are not required to redeem a departing shareholder's shares, assumed that they nevertheless could "provide by agreement . . . for the disposition [i.e., acquisition] of shares in case of [a shareholder's] employment termination." *Id.* at 371. Additionally, in support of its related holding, the *Berrett* court relied on a Florida case that had answered—in light of statutory language similar to that at issue here—the specific question raised by this case. *See id.* (citing *Corlett, Killian, Hardeman, McIntosh & Levi, PA v. Merritt*, 478 So. 2d 828 (Fla. Dist. Ct. App. 1985)). Specifically, Florida's analogous statute provided, "No shareholder of a [professional corporation] may sell or transfer his [or her] shares in such corporation except to another individual who is eligible to be a shareholder of such corporation." *Corlett*, 478 So. 2d at 831 n.6 (cleaned up). Yet the Florida court stated, "[A professional corporation's] articles of incorporation, as always, *may* provide for redemption or purchase of [a shareholder's] shares by the corporation." *Id.*

¶82   Given the fact that sections 16-11-7 and 16-10a-631(1) employ distinct and contrasting language; the fact that these sections are aimed at differing concerns; the fact that our supreme court has already assumed that a professional corporation can reacquire its own shares; and the fact that our supreme court has cited approvingly extra-jurisdictional authority that has expressly said—in light of a statute similar to Utah's—that a professional corporation can reacquire its own shares, we hold that sections 16-11-7 and 16-10a-631(1) are not inconsistent and, therefore, that a professional corporation can reacquire its own shares. We agree with CMP that "[t]his is the only interpretation that complies with

the [Professional Corporation Act's] directive that it 'be so construed as to effectuate its general purpose of making available to professional persons the benefits of the corporate form for the business aspects of their practices while preserving the established professional aspects of the personal relationship between the professional person and those he [or she] serves.'" (Quoting Utah Code § 16-11-3.)

3.     A Material Dispute Remains as to Whether Smith Worked for Clients on the Contemplated Client List After CMP Exercised Its Right to Purchase His Shares

¶83    Finally, Smith argues that even if a shareholder of a professional corporation can legally sell his or her shares to the corporation, the district court erred when it ruled that CMP had purchased his shares because "it is *not* undisputed" that he worked for "clients on the 'client list' contemplated in the contract" after CMP exercised its right to purchase his shares. In this regard, Smith notes that the "paid in full" provision of Article 7.03 of the Shareholders Agreement says that a buyout will be deemed "paid in full" if "during the five year period following [CMP] giving the selling [s]hareholder notice of [CMP's] intent to exercise its [buyout] right" the selling shareholder "perform[s] any services for clients of [CMP], *which client list will be determined as of the date of sale*." (Emphasis added.) Smith then contends that (1) "it is not clear when the court believes a sale occurred" but "[i]t could not have occurred before August 26, 2021, because that is when CMP finally received a ruling on its claim that it had a right to purchase [Smith's] shares" and (2) "there is no evidence in the record of CMP's client list as of that date or of [Smith's] work thereafter." We disagree with Smith that the sale of his shares to CMP did not occur until August 26, 2021. We nevertheless agree that there is no evidence in the record of CMP's client list as of the date of sale, and, absent that evidence, summary judgment on this claim was improper.

¶84    For us to determine that the date of sale did not occur until after the district court ruled that CMP could purchase Smith's shares would require us to conclude that the date of sale could not occur until CMP made payment. We reject that conclusion. Article 7.03 provided that CMP's purchase of a shareholder's shares following a discreditable-acts determination would take place by 120 monthly installment payments beginning one year after CMP notifies the shareholder that it intends to exercise its right to purchase the shares. At the same time, however, the "paid in full" provision would be triggered if the shareholder performed work for a CMP client during the five years immediately after CMP gave notice of its intent to purchase the shares. Because the selling shareholder would need to know as of the date CMP gave notice which clients he or she could not work for without triggering the "paid in full" provision, the "date of sale" in Article 7.03 must be the date on which CMP gave notice of its intent to exercise its right to purchase the shares—in this case, December 12, 2014. No other date makes sense.

¶85    Having determined that December 12, 2014, was the "date of sale," we nevertheless agree with Smith that it is not undisputed in the summary judgment record that Smith triggered the "paid in full" provision. Under Article 7.03, the "paid in full" provision would be triggered if Smith "perform[ed] any services for clients of [CMP], which client list [would] be determined as of the date of the sale, during the five year period following [CMP] giving [Smith] notice of [its] intent to exercise its right" to purchase his shares. Notably, the relevant clients under the "paid in full" provision—namely, those who were CMP clients "as of the date of sale"—are not necessarily the same clients identified in the noncompete provision of the Shareholders Agreement— namely, those for whom CMP or the shareholder had "perform[ed] accounting or tax services for any client of [CMP] during the five year period" immediately preceding termination of the shareholder's employment. Nor are they necessarily the same clients identified in the Employment Agreement's

noncompete provision, who are "any client[s] for whom [CMP] . . . performed accounting services during the twelve-month period immediately preceding [Smith's] termination."

¶86   While the summary judgment record contains a list of roughly 350 clients for whom CMP worked during the one-year period immediately prior to Smith's termination and for whom Smith continued to work after his termination, the summary judgment record does not contain a list of CMP's clients as of December 12, 2014, five months after Smith's termination. Admittedly, there may be some probability that at least one of the 350 or so clients for whom CMP worked during the year prior to Smith's termination and for whom Smith worked after his termination remained a CMP client through at least December 12, 2014. But to base summary judgment on a judicial assessment of that probability would be impermissibly speculative. *See generally State v. Hester*, 2000 UT App 159, ¶ 16, 3 P.3d 725 (noting "a difference between drawing a reasonable inference and merely speculating about possibilities"), *abrogated on other grounds by State v. Clark*, 2001 UT 9, 20 P.3d 300. Yet, whether consciously or not, that is essentially what occurred here. Accordingly, we reverse the district court's grant of a summary declaratory judgment that CMP had already purchased Smith's shares under the "paid in full" provision of Article 7.03.


CONCLUSION

¶87   The district court exceeded its discretion by dismissing Smith's third-party complaint against the Other Shareholders as a rule 37 discovery sanction, because the Other Shareholders did not move for rule 37 sanctions. The court again exceeded its discretion when it barred Smith under rule 26 from presenting his own declarations and the Spreadsheet as evidence, because Smith's failure to disclose himself as a potential witness and the Spreadsheet as potential evidence was harmless. When Smith's declarations and the Spreadsheet are considered, CMP was not

entitled to summary judgment on its claims against Smith for breach of the Employment Agreement and any related claims for declaratory relief at odds with our analysis herein. We therefore reverse those claims. Additionally, CMP was not entitled to a declaration on summary judgment that it has already purchased Smith's shares, because there remain disputed issues of material fact on that claim. We therefore reverse that ruling. But because we conclude that a professional corporation may reacquire its own shares, CMP remains free to develop the factual record and pursue that claim on remand. Finally, we affirm the district court's grant of summary judgment in favor of CMP on its claim against Smith for breach of the noncompete provision in Article 9.01 of the Shareholders Agreement because Smith did not challenge that ruling on appeal. In short, we affirm in part, reverse in part, and remand this matter for additional proceedings consistent with this opinion.

—————